Jose CISNEROS et al.

v.

**CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT et al.**

Civ. No. 68-C-95.

United States District Court,
S. D. Texas,
Corpus Christi Division.

July 2, 1971.

Chris Dixie, James Wolf, Eric Nelson, Houston, Tex., James De Anda, Corpus Christi, Tex., for plaintiffs.

J. W. Gary, Richard Hall, Corpus Christi, Tex., for defendants.

## MEMORANDUM OPINION

SEALS, District Judge.

I. Background of this Litigation

Plaintiffs brought this action against the Corpus Christi Independent School

District to require the District to comply with guidelines promulgated by the Supreme Court for the creation of unitary school systems wherever dual school systems have been found to exist. Plaintiffs contended (1) that Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and its progeny, apply to Mexican-Americans as well as to Negroes; (2) that Mexican-Americans have been and remain segregated in the Corpus Christi Independent School District; (3) that Negroes have been and remain segregated in the Corpus Christi Independent School District; (4) that therefore, a dual school system has existed and still exists in Corpus Christi with regard both to Mexican-Americans and to Negroes; (5) that such segregation of Mexican-Americans and Negroes has been and remains primarily de jure segregation; and (6) that the court should order the Corpus Christi Independent School District to disestablish its dual school system and to erect a unitary school system, in compliance with decisions of the Supreme Court and the Court of Appeals for the Fifth Circuit.

Defendants asserted, on the other hand, (1) that Brown v. Board of Education of Topeka, supra, does not apply to Mexican-Americans; (2) that even if *Brown* applies to Mexican-Americans, that ethnic group has not been and is not now segregated in the Corpus Christi Independent School District; and (3) that even if *Brown* applies to Mexican-Americans, and Mexican-Americans have been and are now segregated in the Corpus Christi public schools, such segregation has been and remains de facto rather than de jure segregation.

On May 14, 1970, the court commenced the trial of these issues, and continued daily thereafter, except from May 25 through May 29, until the conclusion of the evidence on June 3, 1970. Then, after eleven days of trial, the court rendered its oral opinion and partial final judgment on June 4, 1970.

In that ruling, Cisneros v. Corpus Christi Independent School District, 324 F.Supp. 599 (S.D.Tex., 1970), the court found (1) that "Mexican-American students are an identifiable, ethnic-minority class sufficient to bring them within the protection of *Brown* [supra]"; (2) that "Mexican-American students in the Corpus Christi Independent School District are now separated and segregated to a degree prohibited by the Fourteenth Amendment in all three levels of the school system: elementary, junior high, and senior high"; (3) that "Negro students in the Corpus Christi Independent School District are also segregated to a degree prohibited by law * * *"; and (4) that although "some of the segregation was of a de facto nature," the Corpus Christi Independent School District is fundamentally "a de jure segregated school system." Cisneros, supra, at 606, 608, 615, 616, 620.

In its judgment of June 4, 1970, the court also ruled that, since an immediate appeal by defendants might materially advance the ultimate determination of the litigation, defendants should exercise their right of appeal under the emergency appeal provisions of Rule 2, Federal Rules of Appellate Procedure. The court also certified an interlocutory appeal under 28 U.S.C. § 1292. On July 10, 1970, the Court of Appeals for the Fifth Circuit denied defendants leave to appeal from this court's interlocutory order of June 4.

In its judgment of June 4, the court requested that each party submit the names of 15 persons (5 Anglo, 5 Mexican-American and 5 Negroes) from whom the court would select a human relations committee, to be representative of the community, and not to include attorneys, parties to the suit, school employees, or the spouses of any of these. The court clerk selected at random six persons from each party's list, and these individuals have since functioned as a human relations committee.[1]

1. The original members of the committee were: Mr. Alvino Campos (chairman),

Mr. Clemente Garcia (vice chairman), Mrs. Martha Gaertner (secretary), Dr.

## II.  The Victoria Hearing

### A.  A Chronology

Soon after the original decision, a hearing was conducted in Victoria, Texas, to determine how a unitary school system might be best effectuated. The hearing was held in that city because of the damage to Corpus Christi caused by Hurricane Celia and the subsequent use of the United States Courthouse for emergency relief. The Victoria hearing lasted from September 2, 1970 to September 16, 1970 and the court heard testimony from Corpus Christi school officials, persons with experience in formulating integration plans, education experts, a private bus company operator, and interested citizens. The main thrust of all the testimony presented by both parties was to formulate a plan which would be educationally and economically sound, and would achieve a unitary school District. Understandably there were differences of opinion on how to do this and on what was "educationally sound" and what was a "unitary" school district. Any ideal plan will begin to break down when it must be put into reality. Since the school district was Corpus Christi and not Utopia, much of the testimony centered on what costs—operational and social—one plan or another would entail. Transportation costs, transportation time, transportation safety, school pairing, grade pairing, single grade schools, modular education (the ungraded system presently in use), extracurricular activities, the neighborhood school, administrative difficulties, social mobility, housing patterns, home buying criteria, the value of exposure to different cultures and ideas, possible conflicts with existing state and federal laws or funding procedures, the experience of other Texas school districts and the problem of public acceptance were some of the subjects covered by the testimony.

At the hearing the court considered: the plaintiffs' proposed student assignment plan (Foster plans) filed on August 17, 1970 (a revision of plans submitted during the trial); the school district's revised plan filed on August 31, 1970, after the court had rejected its plan of July 15, 1970, as unconstitutional on August 26, 1970; and the elementary school plan submitted by the plaintiff and which was fashioned by a Corpus Christi housewife and patron of the school system. (Scott plan).

On September 15, 1970, the day before the hearing ended, the plaintiffs moved for the court to request the intervention of the United States Departments of Justice and of Health, Education and Welfare. Since the court had denied a motion for intervention by a non-profit group of Corpus Christi parents, Concerned Neighbors, Inc., in August as be-

Robert Bosquez, Mrs. H. T. Branch, Mr. D. C. Brown, Jr., Rev. R. L. Brown, Mr. Huey Dorn, Mr. Rufino Garcia III, Mr. Duane McCullough, Mr. Thomas Perry, Mr. Lavernis Royal. Shortly thereafter, Mr. Perry resigned and was replaced by Mrs. John Thomason on August 24, 1970. Since its inception the committee has held 28 meetings, and many conferences with the parties to this suit. It has forwarded copies of its minutes to the court which have been sealed and may be opened only by this or another federal court. The members of the committee have made speeches and met with civic and parental groups in an effort to smooth the path of compliance. The committee has submitted reports and recommendations to the school board and to the court and has in general functioned effectively and worked tirelessly. Their only compensation has been the appreciation of their neighbors and the accolades of the court for their selfless public service.

Because of the heavy workload of the committee it is necessary to expand its membership from twelve to eighteen for the time being. Plaintiffs and defendants through their attorneys shall each select three persons, including one Anglo-American, one Mexican-American, and one Negro-American, which nominees shall be added to the Human Relations Committee. At the end of May 1972, six new members shall be added in the same manner and the original members shall retire. Those persons who were nominated for membership to the original committee, but who did not serve, shall be eligible for membership.

ing untimely, the plaintiffs' unusual motion caused some concern. However, the court came to the conclusion that the experience, knowledge, and objectivity of these departments would aid the development of a unitary plan and so on October 16, 1970, the court requested their assistance. The court was further influenced by the fact that there appears to be a growing National Policy favoring integration as expressed in Government actions and, further, because any integration order would be helped by the active assistance of the Government.

Thereafter, the Office of Education and the United States Attorney's office participated in the conferences held in the case and filed such motions as they desired. A team from the Office of Education conferred with the Human Relations Committee and made trips to Corpus Christi to familiarize itself with the operation of the school system. On April 30, 1971, following the Supreme Court's April 20th decision in the so-called "busing cases," [2] a conference was held with all parties. As a result of that conference an order was issued on May 3, 1971, directing the Department of Health, Education and Welfare to submit a plan by June 1, 1971, for the creation of a unitary school system not inconsistent with the guidelines in the *Swann* cases, n. 2 supra. The plaintiffs and defendants were given until June 10th to file their objections. The government's plan was submitted on June 2 and both parties filed their objections eight days later. Shortly after the filing of the HEW Plan, the Human Relations Committee addressed a written exhortation to the Board of Trustees, urging its members "to submit another proposal that has a chance of being accepted by the court." The Committee included a number of recommendations designed to assist the Board in formulating such a proposal.[3] On June 10, the court grant-

2. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577; McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582; North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586; Moore v. Charlotte-Mecklenburg Board of Education, 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590.

3. The correspondence between the Committee and the Board follows:

June 8, 1971

Board of Trustees
Corpus Christi Independent School District
515 North Carancahua
Corpus Christi, Texas

Gentlemen:

Within the next few weeks our school system will be given a court ordered plan of desegregation. We feel that you are singularly qualified to develop a plan for our district. The excellent staff of our district has the ability to conceive a plan that would be relatively more feasible than any other plan, considering their knowledge of our district, it's neighborhoods and economics.

We strongly urge you to submit another proposal that has a chance of being accepted by the court. Our concern is that if you refuse to do this the court will select either the HEW plan or one of the plaintiff's plans and the citizens of of Corpus Christi will have had no voice.

Should you elect to submit a plan to the court, this committee will ask Judge Seals to grant the district until July 1, 1971 to file it's plan. This request should in no way interfere with your intentions or desires to pursue this case all the way to the Supreme Court.

Enclosed are recommendations this committee hopes will be of some assistance to the Board of Trustees.

Sincerely,
Human Relations Committee
/s/ Alvino Campos, Chairman

AC :mg
cc: Judge Woodrow Seals
Dr. Dana Williams
J. W. Gary
Richard Hall
James Wolf
James De Anda
Corpus Christi Caller-Times
KRIS–TV
KIII–TV
KZTV–10

## HUMAN RELATIONS COMMITTEE RECOMMENDATIONS

When deliberations concern our independent school district the first and foremost responsibility must be the education of children. This responsibility must include all children in the district, encompassing every school in the district at every level. Our responsibility should be to see that opportunity throughout the system is equal and guaranteed; that economic and ethnic differences do not affect in any way our providing these opportunities. This also means the opportunity of learning from consistent facilities, equipment, buildings, program and instructors.

The second major responsibility should be to our providors i. e. taxpayer. We must strive to produce good results within his ability and willingness to continue carrying the burden of financing. By the same token the taxpayer must recognize his responsibility to the future and continue to support the public educational system even if he is occasionally at odds with the system or its methods. There is an economically enforced compromise between what the educator would like to or could provide and what the taxpayer could or would support.

Recognizing that our district has been found wanting by the court as regards its stewardship toward some of its children we are faced with the dilemma of correcting in a short period of time a problem that has been in the making for years. The solution again must be balanced between desire and economic reality while striving to achieve the best possible results educationally.

Toward these ends the following proposals are suggested as a method of assuring equality throughout the system as well as achieving learning experiences between the various ethnic groups involved:

1. At the high school level attempt to achieve a better balance between ethnic groups than is presently being accomplished mainly by some gerrymandering of district boundries.

The need for extensive mixture of this age group is questionable since by this time impressions and opinions have long since been formulated. Also, since high school districts are geographically much larger than elementary schools they of necessity cut through many different neighborhoods and generally provide a better ethnic balance than lower level and smaller schools. As an example either the HEW or committee plan should fulfill the high school needs.

2. At the junior high level we suggest a plan that would attempt to balance the ethnic groups along a 75–25 or 25–75 ratio, so that the minority group in any school would not be less that 25% as nearly as is feasible. We strongly urge that no transportation islands or satellite zones be utilized.

3. Recognizing that successful desegregation will require skillful handling by administrators and faculty the following proposals are made for elementary schools:

a.) Pair or group schools on a basis that will achieve ethnic balance and that in the opinion of school officials is educationally feasible (considering facilities, space, etc.).

b.) We believe the modular system should be maintained. A possibility for consideration is to have children in the paired schools attend certain classes at one school certain days and on the other days attend classes at their neighborhood schools. For instance, schools A and H are paired—on Tuesdays and Thursdays the intermediate module is transported to school H for reading and english while the advanced module is transported to school A for

arithmetic and science. Other schools could transport on other days so as to reduce transportation. Feasibility of this idea is strictly up to the school staff.

c.) In preference over the HEW plan another possibility to consider is the plaintiff's plan #2, Exhibit 218, for elementary schools which maintains the modular concept and requires relatively little transportation.

d.) Closely examine elementary boundries and attendance zones for changes that should be made on a permanent basis to alleviate over crowding, etc.

4. Consideration should be given to a rotation plan for teachers whereby no teacher would remain in any school longer than three years. When a teacher signed his contract he would know that he would be subject to transfer every three years. In order to provide continuity within the individual schools approximately one third of the faculty could rotate each year. This would mean at the inception of this program some teachers would move after one year and some after two years until the rotational balance had been established. This would insure that instructors would be in continual rotation throughout the district.

5. Elementary level PTAs in paired schools could function as a single unit drawing their membership from the two school areas. For example, if Wilson and Evans were paired it would become the Wilson-Evans PTA. Monthly meetings would alternate between the two schools and the presidency would be an Evans resident one year and a Wilson resident the next year. This type of arrangement would be particularly helpful since the parents are much in need of developing a rapport between ethnic groups—this would tend to ease the problem.

These suggestions should achieve several factors that the court has been concerned about and at the same time they would be less costly when other options are considered. They are suggestions that we hope the district may find helpful but by no means are they submitted as a complete plan or a complete list of possibilities.

CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT
515 North Carancahua
P. O. Drawer 110
CORPUS CHRISTI, TEXAS, 78403

Mr. Alvino Campos, Chairman
Human Relations Committee
706 Burkshire
Corpus Christi, Texas

Dear Mr. Campos:

Your letter of June 8, 1971 with committee recommendations attached was immediately shared with each member of the Board of Education and our Administrative Staff. The recommendations which you made have been carefully considered. Our response would have been discussed at our board meeting on June 21 had the item not been inadvertently left off of our agenda.

In order that there might not be an unnecessary delay in advising the committee of the general attitude of our board concerning your recommendations, I am taking it upon myself to send you a document which has been shared with other members of our board. I am of the opinion that the board agrees with the information contained in the response since each member has had an opportunity to study and review it. Our Board of Education will be meeting on Monday, June 28, 1971, and at that time the attached response will be discussed. If there are any changes, you will be notified immediately. In the meantime, I am of the opinion that you can be reasonably sure that the document does express the combined thoughts of our Board of Education.

The Board of Education joins with me in recognizing the committee for the time and effort which it has given in making its recommendations to us. We sincerely respect the recommendations you have made and likewise ask the same consideration of us from your committee.

Sincerely yours,
(s) Forrest C. Allen, President
Board of Education of the
Corpus Christi Independent School District
fp
Enc.
cc: Dr. Dana Williams

**CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT**
515 North Carancahua
P. O. Drawer 110

**CORPUS CHRISTI, TEXAS, 78403**

TO: Human Relations Committee

FROM: Forrest C. Allen, President of the Board of Education of the
Corpus Christi Independent School District

SUBJECT: RESPONSE TO HUMAN RELATIONS COMMITTEE RECOM-
MENDATIONS

The Board of Education is pleased that the Human Relations Committee joins
the Corpus. Christi Independent School District in expressing the conviction
that the education of children should be the first and foremost consideration in
determining deliberations concerning the school district. The Board agrees
that these educational considerations must include all children in the district
and encompass each school in the district. It has long been the Board's conviction
that educational opportunity throughout the system be equal and guaranteed,
that economic and ethnic differences have no effect on providing such oppor-
tunities, and that the vehicle for providing educational opportunities should be
consistent for each child on each school campus. In addition, the Board is
pleased to note that the Human Relations Committee is also concerned about
economic considerations and their relationship to education excellence. The
citizens of the community have repeatedly demonstrated their ability and will-
ingness to finance appropriate educational programs. The Board joins the
the committee in their expression that educational programs must be tailored
to the community's ability to support such programs and must meet the test of
accountability.

The Board however cannot accept nor support all of the recommendations made
by the Human Relations Committee and still maintain the excellence of educa-
tional opportunities offered in this community. Each recommendation is here-
inafter considered and the Board's position concerning this recommendation is
noted:

1. At the High School level attempt to achieve a better balance between ethnic
groups than is presently being accomplished mainly by some gerrymandering of
district boundaries.

The need for extensive mixture of this age group is questionable since by this
time impressions and opinions have long since been formulated. Also, since high
school districts are geographically much larger than elementary schools they of
necessity cut through many different neighborhoods and generally provide a
better ethnic balance than lower level and smaller schools. As an example either
the HEW or committee plan should fulfill the high school needs.

Ans: The Board does not agree that gerrymandering of high school attendance
zones is necessary to accomplish a balance between the racial and ethnic
groups at the senior high school level. The equidistant plan proposed
under protest by the Board of Education provides as effective an ethnic
balance for the district's high schools as does the high school satellite
attendance plan proposed by the Department of Health, Education, and
Welfare.

2. At the junior high level we suggest a plan that would attempt to balance the
ethnic groups along a 75–25 or 25–75 ratio, so that the minority group in any
school would not be less that 25% as nearly as is feasible. We strongly urge
that no transportation islands or satellite zones be utilized.

Ans: The Board feels that it is impossible to realize a consistent minority ratio
of 20% or more in all of the junior high schools in the city through the
gerrymandering of attendance zones. The Board agrees with the Human
Relations Committee that transportation islands and satellite zones should
not be utilized as a means of achieving any set ethnic ratio for the district.
The Board feels further that it is not administratively feasible to establish
identical ethnic ratios in the junior high schools as continued movement
of individuals within the city will rapidly disestablish such ratios thereby
requiring a continual adjustment of boundaries.

3. Recognizing that successful desegregation will require skillful handling by administrators and faculty the following proposals are made for elementary schools:

a.) Pair or group schools on a basis that will achieve ethnic balance and that in the opinion of school officials is educationally feasible (considering facilities, space, etc.).

Ans: The Board cannot accept the proposition that the pairing of elementary schools and the subsequent transportation of pupils made necessary by such pairing will result in a plan that is more educationally feasible than the district's current plan of providing unique educational opportunities to pupils in attendance zones in which they reside.

b.) We believe the modular system should be maintained. A possibility for consideration is to have children in the paired schools attend certain classes at one school certain days and on the other days attend classes at their neighborhood schools. For instance, schools A and H are paired—on Tuesdays and Thursdays the intermediate module is transported to school H for reading and English while the advanced module is transported to school A for arithmetic and science. Other schools could transport on other days so as to reduce transportation. Feasibility of this idea is strictly up to the school staff.

Ans: The Board supports the Human Relations Committee in the belief that the modular system is educationally sound and should be maintained. The Board, however, cannot accept the proposition that pupils attend school in alternate elementary schools on alternate days. Such attendance would destroy the continuity of planning essential to any instructional program and critical to any program utilizing the teaming of teachers. The lack of knowledge and understanding of pupils' unique needs, aptitudes, and abilities inherent in such a plan would totally negate any educational advantages of an alternate attendance strategy. It is questionable whether this plan could meet any test of administrative feasibility.

c.) In preference over the HEW plan another possibility to consider is the plaintiff's plan #2, Exhibit 218, for elementary schools which maintains the modular concept and requires relatively little transportation.

Ans: The Board must reject any proposal which involves the transportation of certain pupils in the district as such proposals are discriminatory to those pupils transported. In addition, if an ethnic balance approximating that of the city is the order of the Court, Plaintiff's Plan #2, Exhibit 218 does not meet this order as only ⅓ rather than ½ of a school population is being transported.

d.) Closely examine elementary boundaries and attendance zones for changes that should be made on a permanent basis to alleviate overcrowding, etc.

Ans: The board feels that the suggestion to closely examine elementary boundaries and attendance zones for changes that should be made to alleviate overcrowding is consistent with the Board of Education's practice of realigning school boundaries in the past. However, the suggestion that attendance boundaries should be made on a permanent basis is inconsistent with the proposal to maintain student balance. Making such boundaries permanent would prohibit the Board of Education from subsequent changes of boundaries to equalize subsequent overcrowding.

4. Consideration should be given to a rotation plan for teachers whereby no teacher would remain in any school longer than three years. When a teacher signed his contract he would know that he would be subject to transfer every three years. In order to provide continuity within the individual schools approximately one third of the faculty could rotate each year. This would mean at the inception of this program some teachers would move after one year and some after two years until the rotational balance had been established. This would insure that instructors would be in continual rotation throughout the district.

Ans: The Board must reject the plan proposed by the Human Relations Committee for the rotation of teachers every three years. The energies of the school district in staff development have been directed toward the formulation and training of teacher teams. The rotation of ⅓ of the teaching staff each year would severely hamper this concept and the ability for teacher teams to be continued in the district. Literature in the area of teaming indicates the basic complement of a team must be together a minimum of three years to reach a level of efficiency necessary to go beyond more than

the most rudimentary skills of team planning, team decision making, and team implementation. The rotational plan proposed by the Human Relations Committee would maintain a constant turnover within the team, thereby negating the team's ability to reach a high level of team implementation. There is a strong probability that the Department of Personnel would encounter trouble in recruiting if prospective teachers knew in advance they would not be able to be provided an assignment which would permit a degree of permanency. The rotation of $\frac{1}{3}$ of a school district's staff in any one year could result in the realignment of ethnic and racial ratios of teachers and thereby be in violation of the order of the District Court concerning this matter. In addition, there is a high probability that this type of plan would seriously affect staff morale. Although the rotation of the entire staff every three years is questionable educationally, a plan of rotation consummated over a period of time greater than three years may be operational, and will be considered by the Board of Education.

5. Elementary level PTAs in paired schools could function as a single unit drawing their membership from the two school areas. For example, if Wilson and Evans were paired it would become the Wilson-Evans PTA. Monthly meetings would alternate between the two schools and the presidency would be an Evans resident one year and a Wilson resident the next year. This type of arrangement would be particularly helpful since the parents are much in need of developing a rapport between ethnic groups—this would tend to ease the problem.

Ans: The Board of Education is in no position to dictate to PTAs as to the manner in which they hold their meetings or elect their officers.

In summary, the Board is concerned that the Human Relations Committee failed to note the many programs initiated by this school district to achieve the very objectives established by the Human Relations Committee as legitimate.

The recommendations made by the Human Relations Committee imply that the transportation of junior and senior high pupils is not an acceptable alternative as they strongly urge no transportation islands or satellite zones be utilized. On the other hand, their recommendations imply that the transportation of elementary age pupils is an acceptable alternative to the district's current operational procedures. This inconsistency in the committee's outlook on the educational advantages of transportation is difficult to understand.

The committee has stated that there are more feasible plans available to the school district than those presented by the plaintiff or the Department of Health, Education, and Welfare. Holding such an opinion, the committee should recommend that in their opinion the plans presented by the plaintiff and the Department of Health, Education, and Welfare are not feasible alternatives for this school district.

The Board of Education appreciates the committee's assessment of the expertise of the district's staff. Apparently the court does not agree with the committee's conviction that the staff is singularly qualified to develop a plan which will realize the court's objectives. The Board has drafted two separate plans which the court has declared to be unacceptable. In addition, the court has requested the Department of Health, Education, and Welfare to prepare a plan for consideration.

It is the conviction of this Board of Education that the Corpus Christi Independent School District is a unitary school system. The preparation of additional plans at this time would be inconsistent with this conviction. If the committee does not share the feeling of the Board of Education, it may be advisable for the committee to prepare and submit a plan for the court's consideration.

From analyzing the recommendations of the committee, the Board of Education is pleased that the committee and Board agree on so many basic areas. It is unfortunate that this mutual agreement does not include every aspect of the case. Such lack of consensus is understandable however in areas as complex as the one before us. It is our sincere hope that the Human Relations Committee can support the Board's commitment to quality education in this community and will assist us in finding an acceptable alternative to the transportation of a large number of our children to schools in other sections of the community than their neighborhoods.

ed defendants an additional period, until June 21, to file another plan. The Board declined this opportunity, and so notified the court on June 16. On June 18, the court received a letter containing general proposals for integration, from David Saenz, a school patron and witness for the defendants. This was treated as a motion for intervention and denied on June 28, 1971. No further plans were filed.

B. The Issues at the Victoria Hearing

■ One of the thorniest questions faced in the remedy phase was the amount and cost of transportation necessary to carry a unitary plan into effect. The plaintiffs contended that money would be available from the federal government and that, if necessary, the school district could pledge delinquent taxes as security in purchasing buses. The School District replied that the federal money, though available for transportation, was not available for transportation alone, and that if it did not comply with state regulations on the purchase and acquisition of new equipment it would not receive its share from the Foundation School Fund. Since the decision in North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), this should no longer be a problem. There Chief Justice Burger stated:

> * * * if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees. *Id.*, at 589, 91 S.Ct. at 1286.

If necessary, the state could be enjoined from depriving the school district of its foundation funds where the school district is operating under a desegregation order.

■ The defendants also argued that the plaintiffs' plan would deprive the district of federal monies for programs for the educationally disadvantaged by breaking down the concentrations of disadvantaged pupils. The plaintiffs contended that the funds could follow the pupils. The purpose announced in 20 U.S.C. § 241a is to assist local education agencies serving areas with concentrations of children from low income families. Although the law requires concentrations sufficient to make the grant worthwhile, the concentration is to be determined on an area basis 20 U.S.C. §§ 241c(b), 241d–11(a) (2). It is further provided that additional grants are available for programs and projects "(A) which are designed to meet the special educational needs of educationally deprived children in school attendance areas having high concentrations of children from low-income families and (B) which are of sufficient size, scope, and quality to give reasonable promise of substantial progress toward meeting those needs * * *." 20 U.S.C. § 241e (a) (1). The *program* must be designed to help youngsters who come from high concentration areas. Whether that attendance area is paired or grouped with other areas, or made the satellite zone of a wealthier area will not change the fact that that attendance area contains a high concentration of low-income families. The plaintiffs' contention that the money will follow the child so long as the program is beneficial would seem to be correct.

Another objection voiced by the school district to the plaintiffs' proposal was that the plan would break up the modular education system recently adopted in Corpus Christi and make it difficult to use reading, learning and media (library) centers. On the elementary level the plaintiffs' plan would disrupt the modular system in some schools. It was brought out, however, that the modular system was flexible and could be adapted to an integrated system.

The school district pointed out that the basic plan in Corpus Christi was a neighborhood plan and that the plaintiffs' plan departed from this and would

render unusable certain classroom space and facilities by closing them. The plaintiffs' plan would require several closings and should be resorted to only in the most extreme case. It is unnecessary here.

The school district further objected that the plaintiffs' plan would require a child to attend several elementary schools during his school career. In light of the mobility of the American population this objection carries little weight. In fact, the school district relied on this mobility in arguing that the composition of the neighborhoods would change anyway. This in itself would cause a child to change schools, but physical mobility and resulting changes in neighborhood ethnic composition should not be permitted to deprive a child of an equal opportunity to a quality education.

That families might move to avoid the bogey-man of "forced busing" is another problem of mobility and could create unreasonably low prices for some houses and inflated prices for others. The best way to forestall this is adoption of a plan which will distribute the burden of integration equally and fairly throughout the community.

The school board also pointed out that existing public transportation would be inadequate to handle any large scale transportation needs. This is true. However, the regular city system can provide some relief as can the use of city buses on special routes.

The school board also argued that busing would have an adverse effect on education, extracurricular activities, and on peer group contacts. However, its witnesses could not give a definite distance at which transporting students would be injurious to their physical or mental health, or to their studies. It appears that school buses are in fact a safer means of transporting children to school than any other. As to education and peer groups, the heterogeneous grouping within the school would be beneficial of itself by increasing the opportunity for the exchange of ideas and attitudes. Ex-

tracurricular activities of some students will be limited if schools are not within a short distance of home. However, special bus routes can be arranged to serve the schools after dismissal, and students can still resort to the regular city buses or to car-pools. Participation in extracurricular activity may become more difficult; it will not be impossible. The school authorities could lengthen the day by one period and devote it or some other period to extracurricular activities. Presently, athletic and band practices often require the parents to make special transportation arrangements. Readily available buses may reduce this burden.

The possible cost of purchase and maintenance caused the school district to compare the present tax rate and assessment with other cities. The defendants argued that the tax base was too narrow to support further increases. The plaintiffs countered that areas with less industry than Corpus Christi were generating more tax monies. This is an unfair comparison. People tax themselves to pay for the services they want. Some non-industrial areas have high property values because they are populated by wealthy citizens who derive their income from businesses located elsewhere. If the school authorities decided to finance buses through a tax increase it could be done, but it would not be painless. The plaintiffs did point out that the school district could increase its evaluation if it used the offices of the County Tax Assessor-Collector rather than the city tax office.

Finally the defendants contended that massive busing would create heavy absenteeism and that this would work a corresponding reduction in state funds. Absenteeism would reduce available state funds, but absenteeism need not occur because of a change in attendance zones. If the school board decides to use buses to transport children to schools which are not within walking distance, the school will be just as accessible as the bus route. It was also pointed out at the hearing, and remains true today, that the Spring Branch Independent School

District in the Houston metropolitan area buses all of its students and that the safety and convenience of buses is used as a selling point in the advertising of homes in that area. That buses make the school as close as the front door is also emphasized in advertisements in the Houston papers for new residential developments in the Houston area.[4] It is not really busing which Americans find objectionable, but what is at the end of the bus line.

■ In summary, the defendants put forward a series of objections to the plaintiffs' plan and reasons why no rem-edy could be implemented. They did not develop a unitary plan which was constitutionally permissible even though the burden is theirs and not the plaintiffs. Green v. County Board, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). That they did not is unfortunate, for the court lost the experts it needed the most. Instead, because of its previous stance and the exigencies of the adversary system, the school board refought the battle of the neighborhood schools. It is undeniable that having the school close to the home and the parents enables some parents to reinforce the received education.[5] There is noth-

---

4. Although these ads were not admitted into evidence they, and others like them, could not escape the court's attention and it would not be erroneous to take note of their existence. An ad for the Clear Lake City development calls attention to free bus service for the public intermediate school. Houston Chronicle, June 20, 1971, Home Section p. 14. Trailwood Village has an elementary school within the development and free bus service to the intermediate school and high school in Humble. Houston Chronicle, June 20, 1971, Home Section p. 13. The Park Glen community in the Alief School District features busing for kindergarten and elementary students. Houston Chronicle, June 20, 1971, Home Section p. 5. The Forest West development has bus service to the Catholic elementary school. Houston Chronicle, June 20, 1971, Home Section p. 19. Shenandoah Valley in Montgomery County boasts that the Conroe, Texas schools are "as close as your front door". Houston Chronicle, June 20, 1971, Home Section p. 21. These ads indicate that busing, like neighborhood schools, is not evil *per se*, and, like the neighborhood school, can be used to promote either integration or segregation. The court takes judicial notice of these advertisements and they are admitted into evidence as court's Exhibits 4, 5, 6, 7, and 8.

5. Unfortunately this reinforcement is not always available at home and the supposed benefit of the neighborhood school is not received as the following editorial illustrates:

PEOPLE APART

The American "melting pot" has successfully assimilated a wide variety of representatives from diverse ethnic origins. But we have failed to assimilate Mexican-Americans, who to a great degree remain a people apart.

Mexican-Americans are the "least Americanized" of all ethnic groups in the country, Dr. R. L. Skrabanek, Texas A & M University sociologist, asserts in an article in the current issue of the "International Journal of Comparative Sociology." The Spanish language, he found, was the main bar to Americanization. For more than 100 years their language usage patterns have changed very little.

In a study using interviews taken in 544 Mexican-American homes in Atascosa and Bexar Counties, Skrabanek found no one living in a Mexican-American household and old enough to talk who was unable to speak Spanish fluently. While Mexican-Americans found in higher income levels speak mostly English, those who speak Spanish almost exclusively are highly concentrated in low status occupations. Until language patterns change he foresees little prospect of successful assimilation.

This is a familiar subject in South Texas, argued inconclusively through the years. A number of projects have been initiated with the hope of persuading families to speak English in their homes. None of them succeeded. Only in rare, well educated Mexican-American households are children required to speak English in the home.

Most Mexican-Americans take offense when their use of Spanish is criticized. They miss the point. It is not that a fluency in Spanish is not desirable. On the contrary, all children, whatever their origin, should be able to speak Spanish. The point is that all children should have fluency in English. The difficulty of gaining fluency in English is magnified greatly if English is not learned in the home as the "first" language.

ing wrong or vicious about neighborhood schools. They represent an attempt to provide quality education easily and without distinction to all. It is incorrect to think of neighborhood schools as ends in themselves, rather than means to an end. The question is not the primacy of busing or of neighborhood schools: the question is equal protection. Public schools do not exist for the benefit of persons in one part of the community, but for the benefit of all. All persons should have equal access to the educational opportunity offered by the public school. Where races, religious, or ethnic groups become segregated, this breaks down the concern which individuals should have for the well-being of the whole community and for each of its members. It is this breakdown and the constitutional guarantee of equal protection which creates the duty to act affirmatively to bring about integration of public facilities and precludes reliance on the neighborhood school concept where the housing patterns operate to exclude significant numbers of students of any ethnic group from schools within the district.

In this context, a recent California decision is most illuminating. The Superior Court for Los Angeles County has held that rigid application of the neighborhood school concept in the face of changing housing patterns which created segregated neighborhoods is in fact a denial of equal protection and turns *de facto* into *de jure* segregation. Johnson v. Inglewood Unified School District, Cal.Super.Ct., Los Angeles County, 1970, No. 973–699. The rationale of this decision will have great impact in the North, but as to Corpus Christi it illustrates the point that insisting that children in a segregated neighborhood attend a school in that neighborhood amounts to government supported segregation. See, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, 561–562 (1971).

III.  The Decision in *Swann*

The central question in the minds of all of the parties at the Victoria hearing was what could a federal district court do to achieve a unitary school system and how far could it go. Since the school year had already begun and since the Supreme Court was considering that question, it seemed more prudent to await the decision of that question rather than to act in haste. On April 20, 1971, the Supreme Court decided five cases which resolved the beginning with Swann v. Charlotte-Mecklenberg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

While the Court stated that it was impermissible to require a school system to meet and maintain a racial enrollment in every school which reflected the racial composition of the whole system, still these ratios could be considered as a starting point in the shaping of a remedy. *Id.*, 402 U.S. at 25, 91 S.Ct. at 1280, 28 L.Ed.2d at 571. The Supreme Court went on to hold that a District Court could alter attendance zones, pair or group schools, use noncontiguous zones, and even order busing in an appropriate case. *Id.*, 402 U.S. at 27–31, 91 S.Ct. at 1281–1283, 28 L.Ed.2d at 573–575. It is clear that when school authorities fail to fashion an acceptable plan the District Court is given broad discretion to act within reason to develop and implement a plan which will effectively achieve a unitary school system immediately.

All the pre-school English classes being taught locally can never solve the problem completely. Those who continue to cling to Spanish as their "first" language rarely enter fully into the mainstream of American life. The educational and occupational status of this group remains comparatively low.

There is no wish to turn one's back on the rich cultural heritage from Spain by way of Mexico that is shared by all Texans. There is, instead, the hope that English, the language of the United States, be given the priority that is essential to common understanding among all Americans.
Corpus Christi Caller-Times
March 14, 1971, at 2B.

IV. Description and Evaluation of the Various Plans

The school board submitted student assignment plans for the elementary, junior high, and senior high schools which it felt achieved more integration than presently existed, but which would neither impair the functioning of the modular system nor depart from the neighborhood school concept. The elementary plan was a resubmission of the boundaries which had already been held unconstitutional by this court. The school board was of the opinion that this was the best plan commensurate with the safety and education of the elementary school children. The plans for junior high and senior high attendance areas involved some boundary changing which shifted areas from one zone to another, but left each attendance zone self-contained. These plans can be best described as "modified" neighborhood school attendance zones. In no instance did it approach the ratio of Anglo, Mexican-American and Negro students within the district. Nor did the school authorities pretend that they were doing so; they steadfastly defended the neighborhood school as an indispensible and fundamentally sound educational concept.

Plainly, the school board wished to avoid the expense, dislocation, and public outcry resulting from plans which would involve transporting any significant number of students. Throughout the hearing the plaintiffs made it clear that they were in favor of integration, *not* busing, but that if busing was necessary to achieve unitary schools, it was a permissible tool. In their elementary plan the plaintiffs did not propose to redraw all of the attendance lines and even left undisturbed some schools with heavy ethnic imbalance, presumably in an attempt to defuse the busing issue. For the other elementary schools the plaintiffs resorted to "pairing" of separated schools, i. e., putting all the children from paired schools together grade-by-grade and alternating the grades between the schools (all first graders at school A, second graders at school B, etc., or all grades 1–3 at school A, grades 4–6 at school B, etc.). The plaintiffs recommended that two elementary schools (Washington and Southgate) be closed and their students assigned to Cole Junior High, which would be converted to an elementary school. It was also recommended that Crossley be closed and its students reassigned to Oak Park, Savage and Gibson. Beach Elementary was destroyed by Hurricane Celia and the parties agreed that it should not be rebuilt. Crockett, Furman, Savage and Southgate elementary schools were damaged by the hurricane and non-permanent repairs were permitted to these facilities. By the order of May 3, 1971, the plaintiff and the United States were required to file any objections to permanent repairs to these facilities as outlined in the contractor's estimate of cost of repair. No objections were filed and on June 3, 1971, an order was signed permitting construction to commence.

As to junior high schools, the plaintiffs utilized the "transportation island" or "floating zone" concept to move the school population around so that no school would be "racially identifiable" (85% or more of one group, or of two minority groups by the reckoning of Dr. Gordon Foster, plaintiffs' expert). Under this system a school would have a basic assignment zone around it which would be supplemented by non-contiguous zones—some within walking distance, some not.

The plaintiffs' plan for the senior high schools involved neither pairing nor transportation islands. Instead the attendance zones were adjusted to run more or less perpendicular to the "corridor" area of heavy Mexican-American concentration so that none of the schools were "racially identifiable", even though one ethnic group or the other might be predominant.

The plaintiffs also submitted the Scott plan for the elementary schools which reflected another approach to the use of the "pairing" device.

The plans submitted by the intervenor U. S. Department of Health, Education and Welfare's Office of Education used "pairing" in 32 of the elementary schools and left ten schools unpaired. Of these latter, one, Travis School, had some of its students reassigned to both paired and unpaired schools because of the overcrowding at Travis occasioned by public housing projects. At the junior high level, the H.E.W. paired-off 10 schools and established "satellite zones" between them. In some cases, this merely changed the shape of the schools' contiguous attendance zone, while in others the zone consisted of an area surrounding the school and another area some distance away. Three junior high schools, Haas, Shannon and Driscoll, were unaffected.

The H.E.W. high school plan left King, Ray, and Miller high schools with their present boundaries and set up "satellite zones" between Moody and Carroll.

The plans submitted and resubmitted by the school district based upon a neighborhood school design must again be rejected because the plans fail to integrate the schools or hold out a promise of doing so.

The plaintiffs' plan for the elementary schools would force the closing of several schools against the good judgment of the school board and would put an unnecessary burden on the modular system. The junior high plan appears to be workable and would eliminate what the plaintiffs regard as racially identifiable schools. The high school plan would nearly equalize the Anglos and Mexican-Americans at Ray High School, reduce the Anglo predominance at Carroll and King, reduce the Mexican-American predominance at Moody and increase it at Miller. The number of Negro students at Miller would remain relatively unchanged, and about half the Negro students at Moody would go to Carroll.

The elementary school pairing plan submitted by the H.E.W.'s Office of Education eliminates racial imbalance in all the schools. The minority percentage ranges from a low of 49% to a high of 72%. If busing is used, the paired schools are so grouped that routes could be arranged which would make it possible to pick up the students for several schools along a route and drop them off as the bus reached the school. This is much more satisfactory than shuttles operating between paired schools. The Government's plan would also require the transfer of kindergarten children. This is unrealistic, since not all schools have kindergartens and since kindergarten is only a half-day program. The H.E.W.'s plan would break-up the middle module (formerly grades 3 and 4) of the ungraded system. This is a drawback, but the flexibility of the modular system should enable it to adapt to the change. The H.E.W. junior high plan brings about a reasonable ethnic mix at all of the schools except South Park and Haas. Haas is left predominantly Anglo, and the pairing-off of South Park with Cunningham increases Mexican-American predominance at South Park from 2:1 to 8:1. The H.E.W. plan for the senior high schools would bring about excellent ethnic balance at Moody and Carroll; unfortunately those are the only schools it affects, even though the H.E.W. classified Miller High School as imbalanced with 81% minority enrollment. Better results could have been achieved here by adjusting the Miller-Ray boundary and creating a satellite zone for Miller somewhere in the Ray or King attendance area. As proposed, the H.E.W. high school plan might violate the principle announced in Davis v. Board of School Commissioners of Mobile County, 402 U. S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971), that it is error to treat one part of the school system in isolation from another and integrate only within that part. *Id.*, 402 U.S. at 38, 91 S.Ct. at 1292, 28 L.Ed.2d at 581. It is unfair to put the burden of integration on a few parents and students within the Crockett elementary attendance area of Moody High and the Sanders and Schanen elementary attendance areas of Carroll High. To do so causes neighbor to re-

sent neighbor. Integration is a *community* problem.

It appears to this judge that Americans are more willing to accept a real or imaginary burden if its effects are shared. To place some members of the community under a hardship and to permit others similarly situated to escape is not the way to achieve general acceptance of any plan.

The plaintiffs had no objection to the H.E.W. plan for the elementary schools, but regarded the high school plan as totally unacceptable. The plaintiffs objected to the pairing-off of South Park Junior High and Cunningham Junior High since it would make South Park 85% Mexican-American. The plaintiffs also objected to the combination of Baker and Wynn Seale junior highs because the satellite zone within Baker is almost evenly balanced between Anglos and Mexican-Americans and would do little to alter the imbalance at Wynn Seale. Instead, the plaintiffs proposed that Baker and South Park be dropped from the plan and be replaced by Haas and Shannon junior highs which are approximately 89% and 77% Anglo respectively. Unfortunately, the plaintiffs did not designate the areas which they thought would make better satellite zones.

The school board objected to the entirety of the H.E.W. plan as putting an onerous, expensive and unnecessary burden on the school district, and as a plan which would produce educational chaos. The school district quite accurately criticized certain of the H.E.W.'s suggestions as tardy, too general, and as designed for a bi-racial rather than a tri-ethnic situation. Specifically, the school district contended that the implementation of the H.E.W. plan would impair the functioning and effectiveness of its programs for culturally deprived children by depleting financial resources and scattering students and teachers. Further, the cost of transportation inherent in the H.E.W. proposals would divert funds from general education programs. It was also felt that the H.E.W. plan would damage the pre-school education programs (Kindergarten, Head-Start), the Bilingual-Education program, the use of Listening-Viewing-Reading Centers, Title I Programs, Cooperative Teaching, extra-curricular activities, and student-pupil ratios. Above all, the district objected to the splitting of the intermediate module of the elementary schools called for by the H.E.W. plan. The defendant also objected to the treatment of Travis Elementary School, where some 650 Mexican-American children would be assigned to other schools in the district purely on the basis of ethnicity and with no means of selection or augmentation provided. The school authorities also objected to the administrative confusion the plan would cause and to the use of a different approach to elementary education in the plan than used by the school district in its design of programs and buildings. The school district repeated its objections to any plan which caused students to be transported beyond their neighborhood school and which would discourage parent participation in the educational process.

## V. Implementation of the Court's Student Assignment Plans

### A. The Court's Plan

The present litigation has occupied the court's attention for nearly three years, including 20 days of trial.[6] The vast assortment of pleadings, motions, briefs, reports, proposals, maps, charts, and a variety of other exhibits is

---

6. The records of the U. S. District Clerk's Office reflect that this judge, in addition to arraignments, sentencing and writing opinions, did the following during the calendar years 1969 and 1970:

| 1969 | Pretrials | 240 |
|---|---|---|
| | Trials | 55 |
| | Days in trial | 146 |

| 1970 | Pretrials | 280 |
|---|---|---|
| | Trials | 57 |
| | Days in trial | 140 |

In addition, this judge spent 7 months of each year in Corpus Christi and had to make a 400 mile round trip each weekend for 14 months.

sufficient to fill a small room. Extensive delay has been occasioned by the massive volume of evidence submitted, by natural disaster, and most fundamentally, by the great confusion and uncertainty that has attended virtually all desegregation suits filed throughout the United States during the past several years.

The Supreme Court has made clear, however, that delay can no longer be countenanced:

> " * * * continued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of this Court the obligation of every school district is to terminate dual school systems *at once* and to operate now and hereafter only unitary schools." Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), reh. denied, 396 U.S. 976, 90 S.Ct. 437, 24 L.Ed.2d 447 (1969).

The Court has at last defined the extent to which lower courts can and must implement the mandate to immediately dismantle all dual school systems. The desegregation plans adopted by a district court must be "feasible," "workable," "effective" and "realistic," Swann v. Charlotte-Mecklenburg, 402 U.S. at 31, 91 S.Ct. at 1283, 28 L.Ed.2d at 575. These adjectives are used to describe a plan which promises to replace at once a school system that effectively excluded children from schools because of their race, religion, or ethnic background, with a program which integrates the student population.

The student assignment plans to be described below reflect plans submitted by the parties and alterations made by the court. From the figures available to the court it appears that no school at any level will be ethnically identifiable, although one group or another may be in a majority. No attempt has been made to meet a certain ratio throughout the school system or at any one school. However, there is no school which does not have a substantial number of students from the minority ethnic groups, nor is there any school which does not have a substantial number of Anglos. "Substantial" may be a poor word since it cannot be defined with mathematical precision. We are not, however, seeking mathematical precision, but a system which opens all the schools in the district to attendance by students of *all* ethnic groups in significant numbers. In a district in which the Mexican-American and Negro students are almost one half of the student population attendance by 20% or less Anglo students or 20% or less Mexican-American and/or Negro students at a single school is probably attendance in insignificant numbers. In a school district where only 15% of the students are minority group members attendance by minority students at a single school at around 3% or 5% might not be regarded as insignificant.

The court finds that the following plan has a realistic chance of creating a unitary school system, will not be an undue economic burden and will not disrupt the educational process more than is necessary to secure rights guaranteed under the Constitution. There are to be no exceptions to this student assignment plan for students in extracurricular or co-curricular activities, including but not limited to, class officers, school publications, band, cheer leaders, and athletics.

I. Elementary
A. Attendance zones for the following schools shall remain unchanged, except that they shall be paired, with grades assigned to each as follows:

| | | |
|---|---|---|
| 1. | Sanders: | grades 1–3 |
| | Los Encinos: | grades 4–6 |
| 2. | Fisher: | grades 1–3 |
| | Washington: | grades 4–6 |
| 3. | Wilson: | grades 1–3 |
| | Evans: | grades 4–6 |
| 4. | Schanen: | grades 1–3 |
| | Garcia: | grades 4–6 |
| 5. | Prescott: | grades 1–3 |
| | Yeager: | grades 4–6 |
| 6. | Chula Vista: | grades 1–3 |
| | Parkdale: | grades 4–6 |
| 7. | Crockett: | grades 1–3 |
| | Montclair: | grades 4–6 |
| 8. | Austin: | grades 1–3 |
| | Woodlawn: | grades 4–6 |
| 9. | Shaw: | grades 1–3 |
| | Smith: | grades 4–6 |

10. Allen: grades 1–3
Windsor Park: grades 4–6
11. Furman: grades 1–3
Meadowbrook: grades 4–6
12. Zavala: grades 1–3
Kostoryz: grades 4–6
13. Lozano: grades 1–3
Carroll Lane: grades 4–6
14. Fraser: grades 1–3
Lamar: grades 4–6
15. Moore: grades 1–3
Southgate: grades 4–6
16. Calk: grades 1–3
Crossley: grades 4–6

B. Attendance zones for the following schools shall remain unchanged:

| | | |
|---|---|---|
| Gibson | Menger | Casa Linda |
| Savage | Central Park | Sam Houston |
| Oak Park | Fannin | Lexington |

C. Attendance zones for Travis Elementary shall remain unchanged, except that 800 Mexican-American students, which number must include all Mexican-American students who reside at the La Armada housing units, shall be assigned as follows:

| | |
|---|---|
| 200 | Central Park |
| 100 | Menger |
| 100 | Kostoryz |
| 100 | Gibson |
| 100 | Carroll Lane |
| 100 | Sanders |
| 50 | Los Encinos |
| 50 | Houston |

D. Attendance zones for Kindergarten and Special Education students shall remain unchanged.

II. Junior High

A. Attendance zones for the following schools shall remain unchanged, except for the deletion of students from the following elementary attendance zones:

| | Junior High | Elementary |
|---|---|---|
| 1. | Coles | Southgate |
| 2. | Hamlin | Fisher |
| 3. | Wynn Seale | Furman |
| 4. | Baker | Sam Houston |
| 5. | Barnes | Austin |
| 6. | Browne | Yeager |
| 7. | Haas | That portion of the Fraser Elementary attendance zone that lies within the Haas Junior High attendance zone. |
| 8. | Cunningham | Prescott |
| 9. | Martin | Shaw |
| 10. | Cullen Place | That portion of the Montclair Elementary attendance zone bounded by Ocean Drive, west to Fairfield and South Alameda, thence from South Alameda to Ocean Drive; |

and the addition of students from the following elementary attendance zones:

| | Junior High | Elementary |
|---|---|---|
| 1. | Coles | Fisher |
| 2. | Hamlin | Southgate |
| 3. | Wynn Seale | Sam Houston |

| | | |
|---|---|---|
| 4. | Baker | Furman |
| 5. | Browne | Austin |
| 6. | Barnes | Yeager |
| 7. | Cunningham | That portion of the Fraser Elementary attendance zone that lies within the Haas Junior High attendance zone. |
| 8. | Haas | Prescott |
| 9. | Cullen Place | Shaw |
| 10. | Martin | That portion of the Montclair Elementary attendance zone bounded by Ocean Drive, west to Fairfield and south Alameda, thence from South Alameda to Ocean Drive. |

B. Attendance zones for the following schools shall remain unchanged:
South Park
Shannon
Driscoll

C. Attendance zones for Special Education students shall remain unchanged.

III. Senior High

A. Attendance zones for the following schools shall include all of the following zones as shown on defendants' exhibit 202:

1. Carroll:

| | | | | |
|---|---|---|---|---|
| | 25 | 46 | 68 | 93 | 97 |
| 13 | 26 | 47 | 69 | 94 | 108 |
| 14 | 27 | 57 | 70 | 95 | 109 |
| 23 | 44 | 59 | 80 | 96 | |
| 24 | 45 | 60 | 92 | | |

2. King:

| | | | |
|---|---|---|---|
| 9 | 21 | 65 | 106 |
| 10 | 22 | 66 | 107 |
| 11 | 37 | 67 | |
| 12 | 38 | 102 | |
| 16 | 64 | 105 | |

3. Miller:

| | | | | |
|---|---|---|---|---|
| 17 | 40 | 55 | 79 | 84 | 88 |
| 30 | 41 | 56 | 81 | 85 | 89 |
| 31 | 53 | 77 | 82 | 86 | 90 |
| 36 | 54 | 78 | 83 | 87 | 91 |

4. Moody:

| | | | |
|---|---|---|---|
| 2 | 4a | 50 | 62 |
| 3 | 32 | 51 | 63 |
| 3a | 48 | 58 | |
| 4 | 49 | 61 | |

5. Ray:

| | | | | |
|---|---|---|---|---|
| 5 | 28 | 35 | 52 | 75 | 101 |
| 6 | 29 | 39 | 72 | 76 | 103 |
| 7 | 33 | 42 | 73 | 99 | |
| 8 | 34 | 43 | 74 | 100 | |

B. As shown on defendants' exhibit 202, the following zones shall be divided, with students assigned as follows:

1. zone #1: On north side of Sunnybrook (the side nearer to Corpus Christi Bay): King
On south side of Sunnybrook: Carroll
2. zone #15: To Ray, except that portion bounded by Carver, Greenwood and Kitchen, which portion is assigned to Moody.
3. zone #19: On north side of Gollihar (the side nearer to Corpus Christi Bay): Ray
On south side of Gollihar: King

B. As shown on defendants' exhibit 202, the following zones shall be divided, with students assigned as follows—Cont'd

4. zone #20: On north side of Gollihar (the side nearer to Corpus Christi Bay): Ray
   On south side of Gollihar: King

5. zone #71: On west side of Shaw: Carroll
   On east side of Shaw: Moody

6. zone #98: On north side of Gollihar (the side nearer to Corpus Christi Bay): Ray
   On south side of Gollihar: King

7. zone #104: On north side of Gregory (the side nearer to Corpus Christi Bay): Ray
   On south side of Gregory: King

C. For all zones listed in section III B, supra, the boundary shall run in a straight line down the middle of the named street.

D. Attendance zones for Special Education students shall remain unchanged.

## B. Estimated Cost of Transportation

Although the Government did not make an estimate in its plan of the number of students who would need to be transported, it did estimate the number as 15,000 when the plan was presented to the *Corpus Christi School Board.* Under the plan adopted by the court this figure would be *reduced* by the number of kindergarten children and by the adoption of a different high school plan. The number would be *increased* by the number of high school students who would need transportation under the court's plan.

These exact numbers are unknown, but 15,000 is a good estimate of the maximum number of students who might need or qualify for transportation. Based on a 72 capacity bus and allowing for 12 students to be standing, a loaded bus could carry 84 students, or 168 on one round trip. While a bus might be able to make more than one round trip along a designated route, it is advisable to assume that it will make only one so that a minimum figure of students transported can be ascertained and the cost maximized. Using these figures, approximately 90 buses would be required to transport 15,000 students. Allowing one bus in reserve for every fifteen buses would yield a total of 96 buses as the maximum necessary.[7] At the Victoria hearing, while using a different estimate of bus capacity, the school board calculated the cost of acquisition and use of 96 buses as $1,718,756, broken down as follows.

| | |
|---|---|
| Purchase (@ $8000) | $768,000 |
| Op. Expenses (@ 3501) | 336,096 |
| Bond | 960 |
| Capital Investment | 500,000 |
| Salaries of Maintenance and Admin. Personnel | 113,700 |
| | $1,718,756 |

This figure could be reduced by grants from the State of Texas of $3200 for each bus which qualifies as transporting

7. It should be noted that *even before* the court ordered integration and consequent busing, Mobile (a system of 73,500 students) was already using 207 buses to transport 22,093 students daily for an average round trip of 31 miles; and Charlotte-Mecklenburg (a system of 84,000 students) was busing 23,000 students from kindergarten through high school for an average daily round trip of 15 miles. Swann v. Charlotte–Mecklenburg Board of Education, 402 U.S. at 29, 91 S.Ct. at 1282, 28 L.Ed.2d at 574–575 footnote 11. In Charlotte the District Court found that another 138 buses would be needed to desegregate the system. *Id.* at footnote 12. In Mobile the *average* round trip bus route was 31 miles, and in Charlotte-Mecklenburg it was 15 miles. *Id.* at footnote 11. Assuming that Corpus Christi employed direct shuttles the paired schools which would be the farthest apart are Woodlawn and Austin (round trip 16 miles), and Moore and Southgate (round trip 15½ miles). If the bus route operated through the attendance zone, instead of as a shuttle, the distance would be lengthened. It would have some advantages, however. Children would not have to go to school "A" in order to go to school "B". This would cut down the distance a child would have to walk or ride to transportation, and it would mean that children would not be congregating at the schools in large numbers before school opened. Further, several buses could run along the designated routes so that a child would not be absent if he missed the one shuttle bus. Possible transportation groupings include the attendance zones for the following pairs: 7, 8, and 9; 10, 11, and 14; 2, 3, and 15; 1, 4, 5, and 6; 12, 13, and 16. Other combinations can also be devised.

students who live more than two miles from the school to which they are assigned and for whom public transportation is unavailable. This could be as much as $307,200.

The school district has several options for raising the money necessary to transport those students who qualify for free transportation. Subject to voter approval, the tax base can be broadened or the tax rate can be raised. The school district can work through the county tax office instead of the city office. Funds can be diverted from nonacademic programs. The school district can apply for federal funds under H.E.W.'s Emergency School Assistance Program (Victoria Hearing Transcript pp. 10–57). It may be possible to hire independent contractors to do some or all of the work, or to reach an agreement with the local bus company. Buses can be leased rather than purchased and the Board might wish to use vans (Ford van, Volkswagen bus) instead of the typical school bus on some routes.

Of course, the School Board faces a real limitation on its ability to provide transportation by a circumscribed authority to increase taxes and by the number of buses or other vehicles available. That the school district might not be able to obtain all of the maximum number of buses needed should not, however, cause the court to digress from implementing the most practical plan for achieving a unitary system.

Buses can be used in one of two ways to transport the children safely and effectively, and the better method will vary from pair to pair. Direct "shuttle" routes may be desirable in some instances. In others it may be more effective for buses to follow routes through several school attendance zones picking up students along the route (not necessarily at school), proceed to the paired school for discharge, return through the attendance zones at the other end of the line making pick-ups as they go, and then discharge them at their assigned schools. The process would be reversed in the afternoon.

## C. The Modular System

The court recognizes that its plan splits the intermediate module in the 32 paired schools. There are two feasible alternatives to this result and The Board of Trustees of the Corpus Christi Independent School District may use its discretion to adopt either one for any of the paired schools.

First, each one of the paired schools could be treated as a module. Second, the school district could operate the "1–3" school with a primary module or modules, and an intermediate module with one half of the children drawn from each attendance zone in the pair. The "4–6" school could then operate an intermediate module with one-half of the children drawn from each of the attendance zone in the pair, and an advanced module or modules. The school board may wish to operate all of the paired schools under the court's plan in Section I A, or all under either alternative, or any combination of the three. This decision must be made and announced on or before August 1, 1971; otherwise the court's plan in Section I A will be used.

## VI. Conclusion

The court is exceedingly grateful to the members of the Human Relations Committee, the attorneys (Messrs. James DeAnda, Chris Dixie, J. W. Gary, Richard Hall, Eric Nelson and James Wolf), Dr. Dana Williams and the other representatives of the School District, and above all, to the citizens of Corpus Christi for the interest, cooperation and patience they have exhibited throughout the course of this case. For many it has been an unsettling and traumatic experience.

The court cannot promise that all unpleasantness, unease and disappointment has passed. Corpus Christi must now begin the difficult task of adjusting to a change in her schools, and possibly her social fabric, change which is unpopular with many of her citizens. It is doubtful that there exists one person who is

pleased with every aspect of the court ordained plan.

The plan is *not* the result of a vendetta against Corpus Christi or of a policy of racism. It is the result of the denial of constitutionally guaranteed equal protection to Anglo, Mexican-American, and Negro parents and students. It is the result of a decision by the School Board to defend the status quo and abstain from fashioning a remedy. It is the result of decades of insensitivity to the rights of others and the courts' obligation to secure those rights.

The challenge facing Corpus Christi today is to implement this plan even though it may be unpopular, even though it is appealed. This is the highest test of a free people operating within the framework of a constitution. If we fail, these children will confront the same task tomorrow.

The court directs the intervenor Department of Health, Education, and Welfare to give affirmative assistance to the Corpus Christi Independent School District in implementing the court's plan to achieve a unitary school system. This shall include assistance in the initiating and processing of an application for federal funds for transportation and other uses. The Corpus Christi Independent School District is directed to cooperate in these efforts and to apply for such funds as are available.

Because of the emergency nature of this litigation, the parties are ordered, in the event that any of them decide to appeal this judgment, immediately to prosecute such appeal under Rule 2 of the Federal Rules of Appellate Procedure. Pursuant to an order promulgated by the Court of Appeals for the Fifth Circuit on May 26, 1971, the provisions of Rule 4(a), Federal Rules of Appellate Procedure, are suspended and the parties ordered to file any notice of appeal within 15 days of the date of the final judgment, and to file any notice of cross-appeal within five days thereafter; further, the provisions of Rule 31, Federal Rules of Appellate Procedure, are suspended to the extent that the brief of the appellant shall be filed within 15 days after the date on which the record is filed and the brief of the appellee shall be filed within 10 days after the date on which the brief of appellant is filed; further, no reply brief shall be filed except upon order of the Court of Appeals.

Pursuant to an order promulgated by the Court of Appeals for the Fifth Circuit on May 26, 1971, the provisions of Rule 11 are suspended and the Clerk is ordered to transmit the record in this case to the Court of Appeals within 15 days after the filing of the notice of appeal. The Clerk is further ordered to transmit three legible copies of the record for the use of each of the members of the panel covering all matters pertinent to the issue raised on appeal, including oral or deposition evidence, exhibits, maps, charts, plans, proposed plans, and all such other matters as are relevant to the issues presented.

This opinion and the final judgment to be entered immediately will not be stayed by this court pending any such appeal.

This case shall remain on the docket of this court until the court is satisfied that a unitary school system has been adopted and put into effect.