Jose **CISNEROS** et al., Plaintiffs-Appellees,

v.

**CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT** et al., Defendants-Appellants.

No. 71–2397.

United States Court of Appeals, Fifth Circuit.

Aug. 2, 1972.

For opinion after remand, se 350 F. Supp. 1241.

Chris Dixie, Houston, Tex., James DeAnda, Corpus Christi, Tex., James P. Wolf, Eric H. Nelson, Houston, Tex., for Jose Cisneros and others.

Brian Landsberg, Atty., Civil Rights Div., John N. Mitchell, U. S. Atty. Gen., David L. Norman, Asst. Atty. Gen., Anthony J. P. Farris, U. S. Atty., Dept. of Justice, Washington, D. C., for the United States.

Jack Greenberg, Charles Stephen Ralston, James M. Nabrit, III, Norman Chachkin, New York City, for the NAACP Legal Defense and Educational Fund, Inc., amicus curiae.

Mario Obledo, San Francisco, Cal., Edward Idar, Jr., San Antonio, Tex., for the Mexican-American Legal Defense and Educational Fund, Inc., amicus curiae.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM, and RONEY, Circuit Judges.

DYER, Circuit Judge:

In this desegregation class action brought against the Corpus Christi Independent School District and its Board of Trustees,[1] the district court held that the city's mexican-american and black children were segregated from anglo children in the public school system as a result of official action of the Board in violation of the mandate of Brown v. Board of Education, 1954, 347 U.S. 483,

74 S.Ct. 686, 98 L.Ed. 873; Cisneros v. Corpus Christi Independent School District, S.D. Texas 1970, 324 F.Supp. 599 (*Cisneros I*). The court ordered an immediate reassignment of the District's teaching staff, consideration of the achievement or preservation of a "reasonable mixture" of mexican-american and black students with other students in construction of new schools, the filing of a revised student assignment plan for the purpose of creating "a unitary school system", and the creation of a Human Relations Advisory committee. Subsequently, after extended hearings, the court formulated and ordered into effect a student assignment plan to achieve integration of the school system in accordance with contemporary constitutional guidelines. Cisneros v. Corpus Christi Independent School District, S.D. Texas 1971, 330 F.Supp. 1377 (*Cisneros II*). *See* Swann v. Charlotte-Mecklenburg Board of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. This order was stayed by Mr. Justice Black, sitting as Circuit Justice, pending consideration of the merits of the Board's appeal by this Court.[2]

This is a novel school desegregation case. A large number of mexican-american children attend the public schools of Corpus Christi. Although they are now and have been historically separated in fact from anglos in the schools of the city, this separation has never had a statutory origin. Therefore, unlike cases involving the traditional black-white dual systems, the question is whether the segregation of mexican-american children who are not the victims of statutorily mandated segregation is constitutionally impermissible. We hold that it is, and affirm the district court's finding that the mexican-american children of Corpus Christi are segregated in violation of the Con-

1. Defendants in the case are the School District, the Superintendent of the District, and the President and Members of the Board of Trustees of the District. In Texas, the Board of Trustees is charged with the operation of free public

education systems and it is primarily the actions and policies of the Board to which we refer in this appeal.

2. 1971, 404 U.S. 1211, 92 S.Ct. 9, 30 L.Ed. 2d 15.

stitution. For reasons hereinafter explicated, however, we disagree with the remedy prescribed by the district court and require it to be modified.

Although we are faced with a tri-ethnic school population, the determination below that the relatively few black students in the school system were segregated contrary to law is basically uncontested in this appeal. The district court must, however, also reconsider the remedy with regard to black students in accordance with this opinion.

The Corpus Christi Independent School District encompasses the metropolitan area of Corpus Christi, Texas. The district is crescent-shaped extending approximately 11 miles in length from its southeast to its northwest corner, and varies in width from three to four miles. Following the curvatures of Corpus Christi and Nueces Bays, it is bounded by water on its north, east, and south sides.

In the school year 1969–70, upon which the statistics in this case are based,[3] there were 46,023 scholastics in the public school system. In terms of total ethnic distribution, 47.4% of the school children were anglo, 47.2% mexican-american, and 5.4% black. There are 61 public schools in the school system, 45 elementary schools, 12 junior highs, and 5 senior highs. In terms of ethnic distribution by grade level, of the 24,389 elementary students, 43.4% were anglo, 50.8% mexican-american, and 5.7% black. Of the 11,793 junior high students, 48% were anglo, 46.7% mexican-american, and 5.25% black. Of the 9,841 senior high school students, 56.4% were anglo, 38.9% mexican-american, and 4.6% black.

The ethnic distribution figures further show that in 1969–70, one third of the district's mexican-american high school students attended Moody High School, the enrollment of which was 97% mexican-american and black (11% black). Another one-third of the mexican-american high school students attend Miller High, which is 80% mexican-american and black (14% black). One-third of the district's anglo high school students attend King High, the enrollment of which is over 90% anglo. Another 57% of the anglo high school students attend either Carroll or Ray high schools, each of which is over 75% anglo.

In the junior high schools, approximately 61% of the mexican-american students attend three junior highs which are over 90% mexican-american in enrollment. Over 50% of the anglo junior high students attend junior highs that are over 90% anglo in enrollment. Of the 24,389 elementary level students, approximately 10,178 mexican-americans and blacks (1,250 blacks) attend elementary schools in which over 90% of the enrollment is non-anglo. Approximately 6,561 anglo elementary students attend schools in which the non-anglo enrollment is less than 20%. The enrollment in eleven of the 45 elementary schools in the school system is over 90% mexican-american, over 75% mexican-american in three other schools, over 95% mexican-american and black in four other schools, over 90% anglo in six other schools, and over 80% anglo in nine other schools.[4]

At the elementary level alone, 29 of the 45 schools, or almost a full two-thirds, are clearly identifiable as con-

3. Plaintiff's Exhibit 3–A and the defendant's Exhibit 4 contain descriptions of the ethnic distribution of students and teachers within the school system. The trial court found these exhibits to reflect substantially the same information. Our numerical and statistical evaluations are taken from defendant's Exhibit 4, reproduced in *Cisneros I*, 324 F.Supp. 599, 609.

While we are aware that these enrollment figures were arrived at by a process using a school census of spanish and anglo surnames, we are assured by the parties upon argument that these figures are substantially accurate and realistically reflect enrollment patterns in the system.

4. *See Cisneros I*, 324 F.Supp. at 608–612, n. 12.

sisting of one ethnic derivation. The same total figure comparisons can roughly be made with regard to the junior and senior high schools of the school system.

Highly relevant to these enrollment statistics are the historic and established residential patterns of the city. There is today and has traditionally been substantial residential concentration by ethnic groups in Corpus Christi. The mexican-american and black population of the district is concentrated in a narrow area that comprises the middle part of the district, running roughly southwest to northeast, bordered on the south side by a major city artery, Ayres Street. This residential concentration is referred to throughout the litigation as the mexican "corridor". To the south of Ayres Street, as the corridor boundary, the relative number of mexican-americans and blacks, as opposed to anglos, drops sharply. The southern part of the district exists almost exclusively as an anglo residential area.

Since before 1938, the district has assigned anglo children to schools according to a neighborhood school plan composed of geographic attendance zones. Students of mexican-american descent have always been classified as anglo by the school board. Generally, students attend school at all levels at the school nearest their home. Thus, the imposition of neighborhood school zones over the pattern of marked residential segregation in Corpus Christi has, inevitably, resulted in mexican-american and anglo children being substantially separated in the public schools.

The city's high schools provide a striking example. The first public high school built in the district still in existence is Miller High, built in 1928, and rebuilt in 1966. It is located at the north end of the mexican corridor, although not in the area of highest mexican-american concentration. Its attendance zone until 1968 comprised all the northern part of the school district. In 1949, its enrollment was 78% anglo, 22% mexican-american. In 1950, Ray

High School was built approximately in the center of the school district, to the southeast of the Ayres Street artery which has served as the corridor boundary. It opened with an enrollment that was 87% anglo. A significant number of anglo students was then withdrawn from Miller into Ray High School. In 1958, Carrol was opened in the south central part of the district, again south of Ayres Street, and served an attendance zone that extended beyond Ayres north into the heart of the mexican-american corridor. It opened, however, as a 78% anglo school. While Ray remained fairly constant at its 87% anglo enrollment figure, Miller now had a majority of mexican-american students. In 1965, King High School was opened in the southernmost corner of the district, with an enrollment that was 95% anglo (90% in 1969–70). By this time Miller High had become 71% mexican-american, and 8% black.

In 1968, Moody High School was opened in the heart of the mexican-american corridor as a 96% mexican-american-black school (11% black). Its southernmost boundary was Ayres Street. Its attendance zone encompassed the great majority of the mexican-american concentration of the corridor, sequestering all of that area north of Ayres that once was included in the Carroll attendance zone. Whereas the students that lived in the corridor had formerly been divided in the Carroll, Miller, and Ray schools, their inclusion in the Moody zone now locked over two-thirds of the city's mexican-american high school students into two high schools located in the non-anglo residential area of the city each of which was clearly identifiable as a minority group high school. Importantly, the drawing of the new boundary lines after the building of Moody, in furtherance of the neighborhood school concept, with its withdrawal of significant numbers of mexican-american and black students from Carroll, Ray, and Miller into Moody, decreased the degree of integration in those schools, increased their re-

flected ethnic identity, and further locked the residents of the corridor into their racially and ethnically homogeneous high schools.

With this background we briefly trace the protracted litigation in this case. The suit was filed on July 22, 1968, by the parents of black and mexican-american children, alleging that the local school authorities had operated the schools of the district in a discriminatory manner which resulted in the unlawful segregation of black and mexican-american students from whites. In *Cisneros I, supra,* June 4, 1970, the court found that de jure segregation existed in Corpus Christi. The court held that mexican-americans constituted an identifiable, ethnic-minority group entitled to the Fourteenth Amendment guarantee of equality in public education, and that both mexican-americans and blacks were unconstitutionally segregated in the public schools of Corpus Christi, as a result of official action by the defendant Board.

In *Cisneros II,* July 2, 1971, a court-designed student assignment plan was promulgated, based upon various parts of plans submitted by the District and the Department of Health, Education and Welfare. The court directed that the plan be implemented by the commencement of the fall 1972 school term. The plan, in essence, required the pairing of elementary schools in two levels, a complete revision of high school attendance zones, and further reassignment of specific groups of school children throughout the system to aid in the dismantling of identifiable ethnic group schools. The district court found that extensive busing would be required to implement the new plan, as it contemplated the transportation of approximately 15,000 school children at an initial estimated cost ranging from $1,400,000 to $1,700,000. The School District then had a total of only nine buses transporting 400 students. On July 13, 1971, the Board moved for a stay of the July 2 order insofar as it concerned mexican-american desegregation. On July 16, 1971, a different district judge granted the partial stay. That stay was vacated by an order of this Court on August 5, 1971, but was reinstated by Mr. Justice Black on August 19, 1971.[5] This appeal followed.

The district court's finding that the black students were segregated as a result of constitutionally impermissible state action was not contested at argument. It is clearly supported by the record. The stay order of the district court, entered August 23, 1971, against that portion of the district court plan requiring the immediate integration of the black plaintiffs in this case must be vacated. *See Cisneros I,* 324 F.Supp. at 615, and n. 46.

■ We now turn to the main thrust of this appeal. Although *Brown* arose in the context of segregation by state law, often termed "classical or historical *de jure* segregation," *see* Gomperts v. Chase, 1971, 404 U.S. 1237, 1238, 92 S. Ct. 16, 30 L.Ed.2d 30 (Douglas, Circuit Justice), we think it clear today beyond peradventure that the contour of unlawful segregation extends beyond statutorily mandated segregation to include the actions and policies of school authorities which deny to students equal protection of the laws by separating them ethnically and racially in public schools. *See* Cooper v. Aaron, 1958, 358 U.S. 1, 17, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 and cited cases; Keyes v. School District No. 1, Denver, Colo., 10 Cir. 1971, 445 F.2d 990, 999, cert. granted, 1972, No. 71–507, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728; Davis v. School District of Pontiac, 6 Cir. 1971, 443 F.2d 573, cert. denied, 1972, 404 U.S. 913, 92 S.Ct. 233, 30 L. Ed.2d 186; Bradley v. Milliken, E.D. Mich.1971, 338 F.Supp. 582; Johnson v. San Francisco, N.D.Cal.1971, 339 F.

5. See note 2 *supra.* On August 23, 1971, the district judge who had granted the partial stay, granted a stay of the July 2 order of *Cisneros II* in regard to black students coextensive with his previously entered stay for mexican-american students.

148

Supp. 1315. Such actions are "state action" for the purposes of the Fourteenth Amendment, and result in dual school systems that cannot be somehow less odious because they do not flow from a statutory source. The imprimatur of the state is no less visible. The continuing attempt to cast segregation that results from such action as de facto and beyond the power of the court to rectify is no longer entitled to serious consideration.

Thus, we discard the anodyne dichotomy of classical de facto and de jure segregation. We can find no support for the view that the Constitution should be applied antithetically to children in the north and south, or to mexican-americans *vis-a-vis* anglos, simply because of the adventitious circumstance of their origin or the happenstance of locality. Time has proven the soundness of the view expressed in dissent in *Jefferson II,* which, in focusing upon de facto dicta in *Jefferson I,*[6] said:

> The Negro children in Cleveland, Chicago, Los Angeles, Boston, New York, or any other area of the nation which the opinion classifies under de facto segregation, would receive little comfort from the assertion that the racial make-up of their school system does not violate their constitutional rights because they were born into a de facto society, while the exact same racial make-up of the school system in the 17 Southern and border states violates the constitutional rights of their counterparts, or even their blood brothers, because they were born into a de jure society. All children everywhere in the nation are protected by the Constitution, and treatment which violates their constitutional rights in one area of the country, also violates such constitutional rights in another area.

*Jefferson II* at 397.

The Board, however, conceding the existence of severe racial and ethnic separation in the Corpus Christi public schools, nevertheless maintains that another type of de facto segregation exists here, arguing that this separation is not a result of school board actions and policies but rather of housing patterns, geographic fluctuations, and other social and economic factors prevalent in the city. Moreover, it urges, even if the imbalance could be traced to Board action, it does not fall within constitutional proscription because it has not acted with a discriminatory motive or purpose.

We must also reject this type of continued meaningless use of de facto and de jure nomenclature to attempt to establish a kind of ethnic and racial separation of students in public schools that federal courts are powerless to remedy. Such attempts are confusing and unnecessary. The decision in *Brown* is the clear embodiment of the legal framework for the resolution of these important issues.

*Brown* prohibits segregation in public schools that is a result of state action. It requires simply the making of two distinct factual determinations to support a finding of unlawful segregation. First, a denial of equal educational opportunity must be found to exist, defined as racial or ethnic segregation. Secondly, this segregation must be the result of state action.

We need not define the quantity of state action or the severity of the segregation necessary to sustain a constitutional violation. These factual determinations are better dealt with on a case by case basis. We need only find a real and significant relationship, in terms of cause and effect, between state action and the denial of educational opportunity occasioned by the racial and ethnic separation of public school students.

■■ We affirm the finding of the district court that action by the school district here has, in terms of cause and effect, resulted in a severely segregated school system in Corpus Christi. We

6. United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836 (*Jefferson I*), aff'd en banc 1967, 380 F.2d 385 (*Jefferson II*).

need find nothing more. Discriminatory motive and purpose, while they may reinforce a finding of effective segregation, are not necessary ingredients of constitutional violations in the field of public education. We therefore hold that the racial and ethnic segregation that exists in the Corpus Christi school system is unconstitutional—not de facto, not de jure, but unconstitutional.

*In limine,* we note that there is no serious challenge to the district court's finding that the mexican-americans in the Corpus Christi school system are an identifiable, ethnic-minority class entitled to the equal protection guarantee of the Fourteenth Amendment. Hernandez v. Texas, 1954, 347 U.S. 475, 477–478, 74 S.Ct. 667, 98 L.Ed. 866. See Hirabayashi v. United States, 1943, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774; Yick Wo v. Hopkins, 1885, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220. The Board does contend, however, that segregation of mexican-american children in Corpus Christi is not a result of Board action.

■ The explicit holding of *Cisneros I,* which we now affirm, was that actions and policies of the Board, had, in terms of their actual effect, either created or maintained racial and ethnic segregation in the public schools of Corpus Christi. The district Court found that

. . . [A]dministrative decision by the school board in drawing boundaries, locating new schools, building new schools and renovating old schools in the predominantly Negro and Mexican parts of town, in providing an elastic and flexible subjective, transfer system that resulted in some Anglo children being allowed to avoid the ghetto, or "corridor" schools, by bussing some students, by providing one or more optional transfer zones which resulted in Anglos being able to avoid Negro and Mexican-American schools, not allowing Mexican-Americans or Negroes the option of going to Anglo schools, by spending extraordinarily large sums of money which resulted in intensifying and perpetuating a segregated, dual school system, by assign-

ing Negro and Mexican-American teachers in disparate ratios to these segregated schools, and further failing to employ a sufficient number of Negro and Mexican-American school teachers, and failing to provide a majority-to-minority transfer rule, were, regardless of all explanations and regardless of all expressions of good intentions, calculated to, and did, maintain and promote a dual school system.

*Id.* 324 F.Supp. at 617–620. Each of these findings is clearly supported by the record. But in our view the use of the neighborhood school plan is the direct and effective cause of segregation in the schools of the city.

Here, the Board, by a rigid superimposition of a neighborhood school plan upon the historic pattern of marked residential segregation that existed in Corpus Christi equated the residential homogeny to ethnic and racial homogeny in the public school system, producing inevitable segregation. That there was an absence of state action involved in creating the city's residential patterns is of no significance. The Board imposed a neighborhood school plan, *ab initio,* upon a clear and established pattern of residential segregation in the face of an obvious and inevitable result.

We have considered the Board's claim that its neighborhood school plan was established on racially or ethnically neutral criteria and impartially administered, and is therefore not beyond the pale. This contention, that treatment of mexican-americans the same as anglos lends a patina of non-segregated respectability to the system is, when analyzed, not as pristine as it appears. The Supreme Court made it plain in *Swann* that

[a]n assignment plan is not acceptable simply because it appears to be neutral . . . such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial ra-

cial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments.

402 U.S. at 28, 91 S.Ct. at 1282.

The Board nevertheless argues that unlawful segregation in the constitutional sense cannot exist in the absence of actions by the Board that are intentionally designed to achieve segregation, and that such a discriminatory purpose is absent here. It iterates that in the absence of a malevolent motive, de facto and not dejure segregation exists.

While there is admittedly no catholicity of viewpoint in the Circuits on the question of intentional state action, this Court has never tempered its prohibition of school board actions that create, maintain, or foster segregation by the requirement that a discriminatory intent be shown. The underpinning of our decisions is a determination of the unlawful effect of state action upon the existence of unitary school systems. Lee v. Macon County Board of Educ., 5 Cir. 1971, 448 F.2d 746, 752; Stout v. United States, 5 Cir. 1971, 448 F.2d 403, 404, citing Cooper v. Aaron, *supra*; Bush v. Orleans Parish School Board, E.D.La. 1960, 190 F.Supp. 861, aff'd sub nom. City of New Orleans v. Bush, 1961, 366 U.S. 212, 81 S.Ct. 1091, 6 L.Ed.2d 239; United States v. Texas, E.D.Texas 1971, 330 F.Supp. 235, Part II, aff'd as modified, United States v. Texas, 5 Cir. 1971, 447 F.2d 441; *see* Wright v. City of Brighton, Ala., 5 Cir. 1969, 441 F.2d 447, cert. denied, Hoover Academy v. Wright, 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190; Hall v. St. Helena Parish School Board, 5 Cir. 1969, 417 F.2d 801, 807, cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180; Henry v. Clarksdale Municipal School District, 5 Cir. 1969, 409 F.2d 682, 687, cert. denied, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242.

This principle has now become the law of the land. In Wright v. Council of City of Emporia, 1972, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51, the Supreme Court held that the city could not create a new school district separate from that of the surrounding county where "its effect would be to impede the process" of the court-ordered dismantling of a dual school system, *id.* 92 S.Ct. at 2207, finding that under its previous decisions in Green v. County School Board, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, and Monroe v. Board of Commissioners, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L. Ed.2d 733, school board action must be judged "according to whether it hinders or furthers the process of school desegregation." *Id.* 92 S.Ct. at 2202. Citing with approval our decisions in *Lee* and *Stout, supra,* the Court rejected the "dominant purpose" test adopted by the Fourth Circuit decision in the case, focusing rather "upon the effect—not the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual system. . . . [T]his 'dominant purpose' test," said the Court, "finds no precedent in our decisions." *Id.* at 2203.

Importantly, the dissent voiced no opposition to the discarding of purpose and motivation, but objected only to the majority's factual determination that the action of the city in creating its own school district would impede the progress of desegregation.

School cases serve to emphasize the correctness of this principle, for regardless of motive, the children that suffer from segregation suffer the same deprivation of educational opportunity that *Brown* condemns. No one would suggest that the validity of a segregation law depends upon the legislators' motives in enacting it, or that such a law is unconstitutional only when it can be ascribed to racial animus. Why then the distinction between types of school board action that produce segregation? "[T]he factor of malevolent motivation is farther from the core of invidiousness that condemns explicit racial discrimination than are the odious effects produced."

Goodman, De Facto School Segregation: A Constitutional and Empirical Analysis, 60 Calif.L.Rev. 275, 291 (1972).[7]

■ Next we direct our attention to the hiring and reassignment of mexican-american teachers. The district court held that the faculty and administrative staff of the system were more segregated than the schools, and used this finding as further evidence of an unlawfully segregated school system. The Board was directed to assign black and mexican-american teachers throughout the system on the same ratio of percentages they comprise of the total teacher and staff population.[8] This finding is clearly supported by the record and the court's order is necessary to bring the Board into compliance with Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211, 1218 (en banc); Ellis v. Board of Public Instruction of Orange County, 5 Cir. 1970, 423 F.2d 203. The requirement of percentage assignments of faculty was presaged by the decision of the Supreme Court in United States v. Montgomery County Board of Education, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263, in which the Court held that as a goal, the ratio of white to black teachers be substantially the same in each school as the ratio of white to black teachers throughout the system. This method of faculty desegregation has been endorsed by the Court in Swann, supra, 402 U.S. at 19–20, 91 S.Ct. 1267, 28 L.Ed.2d 554.

■ The trial judge further found, and we agree, that the Board had discriminated against mexican-americans by failing to employ mexican-american teachers in the system, and ordered that it move immediately to employ more.[9] In order for the dual nature of the system to be realistically dismantled, faculty composition must more truly reflect the ratio of mexican-american students to the total scholastic population of the school district. The Board therefore must continue its efforts, which we acknowledge as substantial, toward the achievement, as a goal, of a ratio of mexican-american teachers to total fac-

---

7. Prior to the decision in Wright v. City of Emporia, supra, the Tenth Circuit, in Keyes v. School District No. 1, Denver, Colo., 10 Cir. 1971, 445 F.2d 990, 1004–1005, cert. granted, 1972, No. 71–507, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728, rejected our position in Lee and Stout with regard to purpose and motivation in school cases. The district court in Keyes ordered the desegregation of several schools in the core area of Denver, the population of which was historically predominantly black and hispano, on the ground that these schools were segregated in fact, producing an inferior educational opportunity contrary to the mandate of Brown. The lower court determined, however, that this segregation, unlike that in the schools of the Park Hill area of Denver which it ordered desegregated, resulted primarily from causes other than school board action, although some Board policies had unintentionally operated to exacerbate the degree of imbalance. Keyes v. School District No. 1, Denver, Colo., D.Colo.1970, 313 F.Supp. 61.

The Tenth Circuit refused to enforce the order to desegregate these core area schools, finding that a constitutional deprivation did not exist in the absence of proof that they were segregated as a result of intentional state action. We have no doubt that the view that racially or ethnically motivated state action is a necessary prerequisite to the establishment of a constitutional violation in the field of public education is overruled by the decision in Wright. The remaining issue in Keyes is simply a factual one relating to causation which is inapposite to the case sub judice. See Petitioner's Brief for Certiorari, Keyes v. School District No. 1, supra, appeal docketed, No. 71–507, October 8, 1971.

The determination that no discriminatory purpose need be shown makes it unnecessary for us to consider whether the record reveals intentionally discriminatory Board action.

8. Cisneros I, 324 F.Supp. at 623, and n. 56 at 619–620.

9. Cisneros I, 324 F.Supp. at 623, and n. 57 at 620. In 1969–70, out of 1,909 teachers in the system, 80% were anglo, 17% mexican-american, and 3% black. During that year, the student enrollment in the system was 47.4% anglo, 47.2% mexican-american, and 5.4% black.

ulty that approaches the ratio of mexican-american students to the total student population. In United States v. Texas Education Agency, 5 Cir. 1972, 467 F.2d 848 (*en banc*) [No. 71–2508], today decided, we pointed out, however, that "[t]*he school board need not, of course, lower its employment standards. A showing of a good faith effort to find sufficient qualified Mexican-American teachers to achieve an equitable ratio, will rebut any inference of discrimination.*" *Id.* at 873.

We turn now briefly to the position of the United States, the invited intervenor in this case. Essentially, it argues that we are confronted with de facto segregation with "maybe something more than isolated discrimination." The intervenor contrasts this with traditional dualism where the segregation is system wide because that is what the law required, and thus the remedy had to be system wide. But here, it is suggested, the remedy should be applied only to the areas which have become segregated by Board action.

Such an approach is untenable here in view of our holding that over two-thirds of the public school students in Corpus Christi are the victims of unconstitutional ethnic and racial segregation. There is established here an overwhelming pattern of unlawful segregation that has infected the entire school system. To select other than a system-wide remedy would be to ignore system-wide discrimination and make conversion to a unitary system impossible. *See* Green v. County School Board, *supra.* A majority of the Court, Chief Judge John R. Brown and Judges Wisdom, Gewin, Thornberry, Goldberg, Simpson and Ingraham, concur in this part of the opinion. Judges Bell, Ainsworth, Morgan and Roney concur in the result.

### REMEDY

We turn now to the remedy fashioned by the district court. We conclude that a different approach may achieve a constitutional result without involving the conversion of the school system from a non-transportation to a transportation basis to the extent ordered by the district court.

On remand, the district court is directed to desegregate the school system on the following basis:

■ (1) It is the prerogative and duty of those local officials having charge of the Corpus Christi Independent School District to formulate and implement student assignment plans.

■ (2) Where a student assignment plan is found to be unconstitutional, as here, because of the existence of segregation which has been imposed by statute or by official act against blacks and an identifiable ethnic group (here the mexican-american students), it is the duty of the school officials to forthwith formulate and implement such student assignment plan as will remedy the discrimination which has been found to exist. Where one race schools continue to exist, school authorities must show that such schools are not the result of present or past discrimination on their part. *Swann,* 402 U.S. at 26, 91 S.Ct. 1267, 28 L.Ed.2d 554.

(3) In the event the school officials abdicate this responsibility or fail to remedy the discrimination forthwith, the district court is empowered to and should proceed forthwith to remedy the discrimination.

(4) Usually in rural, and in some city school districts where the population is diffused, assignment on a strict neighborhood basis has been sufficient to eliminate discrimination in student assignments. It is apparent that this will not suffice in the Corpus Christi Independent School District, although it may suffice as to some schools. To the extent that it does not suffice, the district court will proceed to employ other methods of desegregation.

(5) The pairing or clustering of schools, the realignment of school assignment zones, and the relocation of portable school rooms will be methods of eliminating segregated schools. Pairing or clustering should be of schools

in close proximity. The pairing or clustering of schools in close proximity and the realignment of school zones will result merely in an expansion of the neighborhood or community school concept. Such transportation problems as may arise will thereby be minimized. Another method of eliminating segregated schools with little increase in transportation is to restructure the assignment of students already being transported.

 (6) If after utilizing the procedures outlined above, proscribed segregated schools still exist, the court must consider the pairing or clustering of schools in non-contiguous school zones. *Swann*, 402 U.S. at 28, 91 S.Ct. 1267, 28 L.Ed.2d 554. No such pairing or clustering of non-contiguous school zones may be required until the court has exhausted every other possible remedy which would not involve increased student transportation. Whenever the court must exercise its power to pair or cluster schools located in non-contiguous zones, it must minimize student transportation requirements in such plan as is devised to pair or cluster schools located in non-contiguous zones.

 The length and time of travel for students under any plan must be considered in light of the age of the children, and the risk to health and probable impingement on the educational process. *Swann*, 402 U.S. at 30–31, 91 S.Ct. 1267, 28 L.Ed.2d 554. The material consideration in assessing the probable effect on health and the educational process as to each particular child will be the time required for transportation as distinguished from distance. Under some plans, children will be transported from their neighborhood school to the school of assignment rather than from their homes to the school of assignment. In such event, the time consumed in travel must include the time necessary to reach the neighborhood school or other point of embarkation.

 In fashioning transportation plans the school board and district court must avoid invidious discrimination on the basis of race or national origin through the imposition of the burden of desegregation on one or both of the minority groups. Lee v. Macon County Board of Education, *supra*, 448 F. 2d at 753–754; Mims v. Duval County School Board, 5 Cir. 1971, 447 F.2d 1330, 1331–1332.

(7) As the Supreme Court made clear in *Swann*, the requirement of "any particular degree of racial balance or mixing . . ." as a matter of substantive constitutional right would be disapproved. 402 U.S. at 24, 91 S. Ct. at 1280. Such racial balance as may result from the pairing or clustering or rezoning of schools is constitutionally permitted as "an interim corrective measure." *Swann*, 402 U.S. at 27, 91 S.Ct. 1267, 28 L.Ed.2d 554.[10]

An overall amelioration of any possible discrimination will tend to be accomplished by the use of the mandatory majority to minority transfer provision of *Swann*, *supra*, 402 U.S. at 36–37, 91 S.Ct. 1267, 28 L.Ed.2d 554, heretofore ordered by the district court. Such a provision will guarantee to both races an unfettered right to attend schools with members of an opposite race or identifiable ethnic group, and with transportation provided. The district court is directed to constitute a tri-ethnic committee in the school district to foster the use of the majority to

---

10. In making certain that the school system is unitary and that the discrimination has been eliminated, we have required that specified reports be filed for three years and that the case not be dismissed thereafter without giving notice to plaintiff. Youngblood v. Board of Public Instruction of Bay County, Florida, 5 Cir. 1971, 448 F.2d 770; Wright v. Board of Public Instruction of Alachua County, Florida, 5 Cir. 1971, 445 F.2d 1397; *see* Swann, 402 U.S. at 31–32, 91 S.Ct. 1267, 28 L.Ed.2d 554 on the termination of federal court intervention in school cases.

minority transfer.[11] A majority of the Court, Judges Bell, Thornberry, Coleman, Ainsworth, Godbold, Morgan, Clark, Ingraham and Roney concur in this part of the opinion.

Affirmed in part, modified in part, and remanded.

GEWIN, Circuit Judge, with whom JOHN R. BROWN, Chief Judge, and WISDOM, GOLDBERG and SIMPSON, Circuit Judges, join, concurring in part and dissenting in part:

This court today approves the district court's findings of fact and affirms its statement of the applicable law. But for reasons not stated in the opinion and certainly not apparent from the record, a majority of this court concludes that "a different approach [as to remedy] may achieve a constitutional result without involving the conversion of the school system from a non-transportation to a transportation basis to the extent ordered by the district court." I believe that today's modification-by-deletion of the district court's remedy ignores both the facts as found and the procedure followed during that court's year long effort to fashion a remedy. I therefore dissent from the "modification" of the ordered remedy.

As a member of the original panel which heard this appeal argued and as one who has painstakingly examined the record below, I fully concur with Judge Dyer's graphic and detailed description of the operation of the Corpus Christi schools and the approval of the district court's finding of school board segregation. I particularly endorse Judge Dyer's explicit abandonment of distinctions in the constitutional rights of school children based on the source or purpose of state fostered segregation.

After years of tortuous school desegregation litigation in this court reflected by hundreds of opinions in numerous volumes, the majority now stumbles and falters over issues which we have decided and laid to rest in almost every geographical area of this circuit. To realize this fact it is not necessary to cite cases; they are legion. We have dealt with practically all major school systems and many minor ones throughout the six states over which we exercise jurisdiction. These decisions have dealt in positive and often stern fashion with the school systems of Atlanta, Savannah, Jacksonville, Miami, Jackson, Birmingham, Mobile, Montgomery, Jefferson Parish, Houston, Fort Worth and numerous others.

In most instances we were following mandates from the Supreme Court which directed us in unequivocal terms to write a decree "that promises realistically to work, and promises realistically to work *now*." Our opinions have related to all facets of desegregation and school integration including transportation, faculty and staff integration, pairing and clustering, non-curricular activities, school construction, the sale of school property, faculty ratios, hiring and firing teachers, racial protests and many others. We have not been a timid or inactive court in dealing with these problems. At times I have disagreed and have expressed my views in dissents, but the court is bound and should be bound by the long list of majority decisions we have rendered.

There is no justification for changing the rules and guidelines which we have hammered out just because the problem presented in this case relates to prohibited racial discrimination against a substantial number of Mexican-Americans and a small number of black students. I can not and will never embrace the idea that the children in Corpus Christi have different or lesser rights than the children in Jackson, Birmingham, Atlanta, New Orleans, Jacksonville and Houston, just because they are Mexican-Ameri-

---

11. The record in Ellis v. Board of Public Instruction of Orange County, Florida, No. 71–2696, now pending in this Court, discloses that in the 1970–71 school term, there were 2,095 transfers of black students under the majority to minority transfer provision out of a total of 15,747 black students in the system.

cans. Moreover, I continue to assert that the Constitution must be applied with equal force in all areas of the nation—North, South, East and West.

Aside from rhetorical criticism of "bussing" the majority opinion utterly fails to demonstrate any defect in the remedy fashioned by the district court or to offer any guidance on the key substantive questions: (1) how much desegregation is required?; and (2) how much bussing is too much? The prescribed seven point "remedy" procedure essentially directs the district court to retrace its steps.

The district court ordered the school board to submit an acceptable plan (Point #2)[1] and the court then held hearings and sought the assistance of private litigants and public agencies to devise a plan of its own (Point #3).

As the majority opinion recognize, over two-thirds of the 46,000 public school students in Corpus Christi are the victims of unconstitutional ethnic and racial segregation. The majority also finds that the rigid imposition of a neighborhood school plan upon the historic pattern of marked residential segregation in Corpus Christi produced this school segregation. It is therefore absurd to believe that the use of strict neighborhood assignment (Point #4) or the pairing of close schools to expand the neighborhood or community school concept (Point #5) will significantly alleviate the existing segregation.

Even a brief examination of the district court's opinion of July 2, 1971, reveals that the court did exhaust the possibilities of zone realignment, and the pairing and clustering of schools in close proximity. The court had the benefit of the Supreme Court's opinion in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L. Ed.2d 554 (1971) and made specific inquiry as to the effects of bussing (Point #6).

The district judge noted that he had made no attempt to meet any certain ratio throughout the school district, but that no school should be without a substantial number of students from minority ethnic groups, and no school should be without a substantial number of Anglo students. The court found that in Corpus Christi where the Mexican-American and black students are almost one-half the student population, attendance in any school of less than 20% Anglo students or of less than 20% Mexican-American and black students (combined) would be insubstantial. The majority opinion does not object to this technique and I find no fault with a balance of "substantiality" as a constitutionally permitted 'interim corrective measure'. (Point 7).

Finally in its enigmatic decree that bussing be minimized even if after exhausting other possibilities segregated schools remain, the court is perfectly obscure on the point which will dominate the proceedings to follow below.

I believe the Supreme Court has delineated the standard with respect to transportation of students. In Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971) the Court rejected a desegregation plan prepared by this court because it was based on treating the western section of the county in isolation from the eastern section. The court stated:

> Like the District Court's plan, the Court of Appeals' plan was based on treating the western section in isolation from the eastern. There were unified geographic zones, *and no transportation of students for purposes of desegregation.* The reduction in the number of all-Negro schools was achieved through pairing, rezoning, and adjusting grade structures within the eastern section.
>
> . . . . . .
>
> A district court may and should consider the use of all available techniques including restructuring of attendance zones and both contiguous

---

1. These headings refer to numbers in the majority opinion under the Section entitled "Remedy."

and noncontiguous attendance zones. See Swann, supra, at 22–31, 91 S.Ct., at 1279–1283, 28 L.Ed.2d at 570–575. The measure of any desegregation plan is its effectiveness.

On the record before us, it is clear that the Court of Appeals felt constrained to treat the eastern part of metropolitan Mobile in isolation from the rest of the school system, *and that inadequate consideration was given to the possible use of bus transportation and split zoning.* For these reasons, we reverse the judgment of the Court of Appeals as to the parts dealing with student assignment, and remand the case for the development of a decree "that promises realistically to work, and promises realistically to work *now.*" 402 U.S. at 36–38, 91 S.Ct. at 1291–1292, 28 L.Ed.2d 580–581. Without reason or authority the majority opinion abandons the mandate of *Davis* and numerous other Supreme Court decisions.

I realize that the remedy as ordered by the district court presents serious financial and administrative difficulties. It is a very substantial matter to direct the bussing of one-third of the district's students. But I do not find it at all surprising that such a remedy might be required in a system where over two-thirds of the students attend segregated schools. The remedy ordered is the consequence of the district court's consideration of precisely those factors and priorities which this court now decrees. I would affirm the order with leave to the district court to amend the order as the practicalities of the situation require in order to avoid undue hardships or burdens on the School Board.

COLEMAN, Circuit Judge (concurring in part and dissenting in part):

Given the decision on the merits as outlined in the majority opinion, I concur in the procedures discussed with reference to the appropriate remedy.

As in United States v. Texas Education Agency, 5 Cir., 1972, 467 F.2d 848 (en banc) [No. 71–2508] I would defer decision on the merits in this case until we shall have received the guidance of the Supreme Court which ought to come with the decision of the *Denver* case, now on the calendar of the Supreme Court.

I, therefore, dissent to deciding the *Corpus Christi* case at this time.

Seeing, however, that the case nevertheless is to be decided, I wish briefly to express some separate views of my own. This is done with considerable reluctance because when the Supreme Court speaks in the *Denver* case my observations may turn out to be legally incorrect or useless.

I am compelled to say that I am unable to agree, as a legal proposition, that the United States is a Country which is composed of "many nations within a nation". We have Americans of Mexican extraction, of Polish extraction, of Irish extraction, of many other extractions, and we have Americans who are either poor or rich. Even so, *an American is an American,* without prefix or suffix— as Mr. Sam Rayburn once said (on another subject).

The idea that there are mexican-americans, afro-americans, or any other hyphenated americans, leads either to divisions among the people or to political "power plays", or both. If a person is an American, that should "end it" and he ought to remember "E Pluribus Unum".

Americans of Mexican ancestry are members of the white race. Therefore, if any children of Mexican ancestry are being required to attend a school which by comparison is deficient in faculty, or curriculum, or school plant, then the school board should be mandatorily required to correct the deficiencies right where they exist. This should be done not because the children are of Mexican ancestry but because *all children* in these United States are entitled to the equal protection of the law.

This would avoid the highly artificial and necessarily unstable expedient of re-

quiring children to spend a substantial portion of their days on buses and in strange localities.

In Brown v. Board of Education, 347 U.S. at 494, 74 S.Ct. at 691, 98 L.Ed. 873 (1954), the Supreme Court said:

"To separate them [black children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."

The same effect is inevitable when children are reminded every day that they live in a community of such inferiority [so considered by those in authority] that they must be bussed out of it for an education, but condemned to remain in it at all other times. Such children will not become integral parts of the communities to which they are bussed. The real, and lasting, remedy would be to improve the housing, the schools, and the living conditions where the children live. The government is equally as able to do this as it is to conduct daily upheavals in mass, via the bus.

My sympathies are with children who are faced with the lack of educational opportunity. I would not claim to cure the problem by the application of a "band-aid" of doubtful, if not harmful, value.

GOLDBERG, Circuit Judge, with whom JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN and SIMPSON, Circuit Judges, join, concurring in part and dissenting in part:

I concur in every word and syllable of Judge Dyer's opinion of superlative excellence until the section captioned "Remedy" is reached. Discerning no error in the decree of the district court, I would affirm without qualification or equivocation.

The Board argues that the remedy fashioned by the district court is so excessive that it is erroneous. I entertain no doubt whatsoever that the methods adopted by the district court in its plan to desegregate the school system, e. g.,

the pairing of schools and alterations of attendance zones, are within the scope of the court's remedial powers. Swann v. Charlotte-Mecklenburg, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. But the critical factor is that the majority itself makes clear today that it entertains no such doubt. Thus, my dissent is compelled as much by confusion at what the majority has done as by disagreement with its remedy. I fail to understand why the majority would agree to the substantive requirements as set forth in Judge Dyer's fine opinion, and then remand to the district court for a remedy based on findings of fact that have already been made.

The majority concludes that student assignment plans are initially the prerogative of the school board. So the district court held, and so we have held on a number of occasions. Yet the majority remands. The majority admits that the school board must bear the burden of proof if it wishes to maintain a system found to be unconstitutionally segregated. So the district court found. Yet the majority remands. The majority concludes that the district court must proceed to desegregate if the board fails to do so. The district court found that the board in Corpus Christi failed to desegregate to any substantive degree, and the district court then proceeded to fashion a remedy. A very able district judge requested that the school board submit a comparative plan for integrating its schools. The board refused to offer any constructive suggestions whatsoever. Cisneros v. Corpus Christi Ind. School Dist., S.D.Tex. 1971, 330 F.Supp. 1377. It is astounding that the school board would then urge that this court delay implementing the district court order when the school board itself failed to advance any constructive suggestion of its own. It is even more astounding that a majority of this court now condones the board's behavior. Yet the majority remands.

The majority endorses pairing, clustering, and realignments of school zones, as indeed it must under the precedents of this court and of the Supreme Court.

158

*See especially* Brown v. Board of Education of Bessemer, Alabama, 5 Cir. 1972, 464 F.2d 382. The district court paired, clustered, and realigned school zones. Yet the majority remands. The majority concludes that transportation may as a last resort be required to eliminate segregation in the Corpus Christi schools. If transportation is required, the majority intones, then the district court must order busing. The district court found as a matter of fact that some transportation would be required in Corpus Christi. Yet the majority remands.

In short, every single finding of fact that is necessary to support the majority's substantive reasoning has already been made. Yet the majority remands. The remedy that the majority has engrafted onto the reasoning of the district court and of this court will produce no substantive changes whatsoever in the trial court's original decree—except delay. Without so much as a hint that the findings by the trial judge with regard to the remedy were erroneous, the majority cavalierly consigns the plaintiffs to another round of litigation and the school children of Corpus Christi to another round of segregated education.

"There is a constitutional right that must be vindicated by a desegregation plan—a right possessed by the students of the district, not by the parties involved in the negotiations. If a constitutional right to attend integrated schools actually exists, there must be a way of ensuring that it is not bartered away in a trade-off for other goals or lost because of incompetence or inadvertence."

Comment, "Busing, Swann v. Charlotte-Mecklenburg, and the Future of Desegregation in the Fifth Circuit," 49 Texas L.Rev. 884, 907 (1971).

The board alleges that it will sustain a financial burden in providing any buses necessary for implementation of the court's student assignment plan. In *Swann* the Court found that bus transportation was a normal and accepted tool of educational policy. Notwithstanding the fact that the "remedy . . . may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems." Swann v. Charlotte-Mecklenburg, 402 U.S. at 28, 91 S. Ct. at 1282, 28 L.Ed.2d at 573. Busing is transportation, nothing more. If it is possible to integrate the schools of Corpus Christi without the purchase of a single bus, then that is clearly preferable. But the critical question is integration not transportation.

"It is imperative, then, that the Nation's judicial system be able to deal efficiently with the basic concept of busing. If the judiciary does not, the future of desegregation may be endangered. . . . Whatever the wisdom of the judiciary's original involvement in desegregation, it would be tragic for the forces of equality to be frustrated, after victory in so many bloody battles, merely because the courts could not rise to the task presented them."

49 Texas L.Rev. at 910.

I doubt that the extent of busing that might be necessary under the district court's original plan has been fully explored by the majority or the school board. I think it is not unlikely that far less transportation and at less cost may be required than that which has been estimated. Because of the density of Mexican-American and black children in the "corridor" area of Corpus Christi, which is approximately in the center of the school district, there may well be a number of alternatives in rearranging boundaries that would reduce the number of children to be bused. Furthermore, during this appeal a bond issue has been approved in which $5.9 million is allocated for building, renovating, and rebuilding various schools. A number of alternatives that do not require transportation are now available in careful site selections. All of this is not to say that the implementation

of the district court's plan should be postponed or placed in limbo while other avenues finally leading to a unitary school system are explored. The school board had its chance, the district court made its findings, and both should now be concluded. Desegregation of the Corpus Christi school system is long overdue, and the plan approved by the district court should be promptly put into effect. But I suggest that with some innovation the segregated system could have been and now can be eliminated without the dire consequences that are conjured up by the school board.

*Swann* and its lineal ascendants and forefathers command us to be sensitive to the trial court's proximity to the problems. This reference to the trial court's localization is particularly persuasive when the trial judge himself, as here, concludes that some drastic action is required. *See* Comment, "School Desegregation after *Swann*: A Theory of Government Responsibility," 39 U. Chi.L.Rev. 421 (1972).

Admittedly the trial court performed needed major surgery in order to purge the system of ethnic prejudice and discrimination. Such surgery has heretofore been confirmed as a therapeutic necessity. I would not incise again and apply a Band-Aid to the incision, as the majority has done with its "remedy." The remand would permit and even auspicate a jejune and mild antiseptic. The ghetto line is clearly marked "Ayres Street" in Corpus Christi, and designating it as the ethnic division point, has infected the whole system. First aid to a toe and then to a finger finds no support in the Supreme Court's diagnosis and prognosis for ending segregation in schools "root and branch." I do not read *Swann* as a countermanding order to patch up the school district and return it to action with a terminal case of the Mexican-American counterpart to Jim Crowism. *See* Comment, "Project Report: DeJure Segregation of Chicanos in Texas Schools," 7 Harv.Civ.Lib. —Civ.Rights L.Rev, 307. If the Su-

preme Court wanted to let roots and branches of discrimination foliate, it would have so decreed. Until its orders are clarion, I will use every effort to despoil any system that permits unconstitutional discrimination in the public schools by whatever descriptive semantics—de facto, de jure, state action. In fact, the Supreme Court reversed one of this court's decisions in a companion case to *Swann*, Davis v. Board of School Commissioners, 1971, 402 U.S. 33, 91 S.Ct. 1289, 28 L. Ed.2d 577. To me this response not only vindicated the efforts that this court has made toward maximizing the integration of the school systems, but indicated that even more rigorous action on our part was called for. Yet the majority remands.

This is not the hour, this is not the day, and Corpus Christi is not the place for courts to flag in their striving for constitutional schools, for quality education, for integrated education. I am aware that the Board's resources are not unlimited. If the district court finds after a plenary hearing with full findings of fact and conclusions of law that the board is unable to carry out any of the plans, then that court or this court may, of course, adjust its order accordingly. Our court must of necessity rely to a large extent on the informed judgment of the district court, the majority's actions today notwithstanding. In my judgment, however, it is also necessary to say clearly that the days of "with all deliberate speed" are gone, and gone forever. The district court plan should be implemented now, for "[t]he obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools." Alexander v. Holmes County, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19. The majority's so-called "remedy" in this case is not an abdication of our past efforts. It is a regression. "Equal protection of the laws" means equal protection, not equivocal protection.

**160**

AINSWORTH, Circuit Judge, with whom BELL and RONEY, Circuit Judges, join, concurs in the result, and in the remedy which the District Court is directed to provide on remand of this case.

GODBOLD, Circuit Judge, with whom COLEMAN, MORGAN, and CLARK, Circuit Judges, join, files the following special opinion.

For the reasons set out in the special opinion of Judge Godbold in United States of America v. Texas Education Agency, et al., No. 71–2508, 5 Cir., 467 F.2d 848, decided this date, we would hold this appeal in abeyance pending further action by the Supreme Court of the United States, and we dissent from consideration of the merits at this time. Directed as we are by a vote of eight judges to seven to consider the merits, we concur in only that part of the opinion of Judge Dyer headed "Remedy."

JOHN R. BROWN, Chief Judge, with whom WISDOM, GEWIN, THORNBERRY, GOLDBERG, DYER and SIMPSON, Circuit Judges, join:

To Judge Godbold's dissent I reiterate my response in 71–2508, United States of America v. Texas Education Agency.