**Genoveva MORALES, as next friend of Daniel Morales, a minor, et al., etc., Plaintiffs-Appellants,**

v.

**E. P. SHANNON, Individually and as Principal of Robb Elementary School, Uvalde County, Texas, et al., Defendants-Appellees.**

No. 73–3096.

United States Court of Appeals, Fifth Circuit.

July 23, 1975.

Rehearing Denied Aug. 19, 1975.

Jesse Gamez, San Antonio, Tex., Sanford J. Rosen, Drucilla S. Ramey, Vilma S. Martinez, San Francisco, Cal., for plaintiffs-appellants.

Grant Cook, Houston, Tex., for defendants-appellees.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

BELL, Circuit Judge:

This school desegregation case seems simple at first blush. It involves a complaint on behalf of Mexican-American students as to the elementary schools in the Uvalde, Texas school district. There are twelve Negro students and one student of Oriental descent in the system but they have not complained. The system has only one high school and one junior high and thus no desegregation problem as such is present as to those. There is no complaint as to kindergarten, a Headstart program.

The desegregation issue in the district court was limited to four elementary schools: Robb, Dalton, Benson, and Anthon. The record has been supplemented in this court to update enrollment and assignment data and it now appears that Batesville, an elementary school located 21 miles south of Uvalde, was consolidated into the Uvalde system in 1973 after the record was closed in the district court.

The difficulty of the case will be seen in the issues. The first, did the district court err in finding no segregatory intent, involves de facto rather than de jure segregation. Second, error is alleged in the failure to find that the grouping of students by ability, as was done in the high and junior high schools, is constitutionally proscribed on the basis of discrimination. Third, error is alleged in the refusal to find discrimination in the failure to provide a bilingual-bicultural educational program, and fourth, in failing to find discrimination in teacher and staff hiring and assignment. In addition to standing alone as assignments of error, as we understand the position of appellants, the second, third and fourth assignments are also asserted in support of the first, i. e., the failure to find segregatory intent. They are, however, of no help in this regard.

The student body composition and assignment in the system will be seen in the following table which reflects the school year 1972–73 for the senior and junior high schools and 1974–75 for the elementary schools:

| Name of School | Grades | No. of Mexican-American | % of M.A. | No. of Anglo | No. of Negro | Total |
|---|---|---|---|---|---|---|
| Sr. High | 7–12 | 514 | 50.5 | 501 | 3 | 1018 |
| Jr. High | 7–8 | 373 | 59.7 | 252 | 0 | 625 |
| West Garden | K | 275 | 87.86 | 35 | 3 | 313 |
| Robb | K–6 | 548 | 95.97 | 19 | 4 | 571 |
| Dalton | 1–6 | 185 | 31.3 | 403* | 2 | 590 |
| Benson | 1–6 | 198 | 60.0 | 132 | 0 | 330 |
| Anthon | K–6 | 353 | 97.2 | 10 | 0 | 363 |
| Batesville | K–6 | 223 | 88.49 | 29 | 0 | 252 |
| | | | | | | 4062 |

* Includes one student of Oriental descent.

I

With respect to the first issue, segregatory intent, we are governed by Keyes v. School District No. 1, Denver, Colorado, 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548, which supervened our holding in Cisneros v. Corpus Christi Independent School District, 5 Cir. (en banc), 1972, 467 F.2d 142, to the extent that Keyes requires, as a prerequisite to

a decree to desegregate a de facto system, as Uvalde admittedly is from the Mexican-American standpoint, proof of segregatory intent as a part of state action. We said not in *Corpus Christi,* holding cause and effect a sufficient basis, but the Supreme Court held to the contrary in *Keyes.* For example, Justice Brennan, for the majority, said:

"We emphasize that the differentiating factor between de jure segregation and so-called de facto segregation to which we referred in Swann is purpose or intent to segregate."

413 U.S. at 208, 93 S.Ct. at 2697, 37 L.Ed.2d at 563.

Indeed a good deal of the burden of Justice Powell's special opinion is addressed to this. He summed up the holding of the majority in Footnote 15 of his opinion as follows:

"The Court has come a long way since Brown I. Starting from the unassailable de jure ground of the discriminatory constitutional and statutory provisions of some States, the new formulation—still professing fidelity to the de jure doctrine—is that desegregation will be ordered despite the absence of any segregatory laws if: (i) segregated schools in fact exist; (ii) a court finds that they result from some action taken with segregative intent by the school board; (iii) such action relates to any 'meaningful segment' of the school system; and (iv) the school board cannot prove that its intentions with respect to the remainder of the system were nonsegregative."

413 U.S. at 230, 93 S.Ct. at 2708, 37 L.Ed.2d at 575–76, n. 15.

■ The district court here, applying the teaching of *Keyes,* found no segregatory intent with respect to student assignment. We hold that this finding is clearly erroneous.

The facts are that as early as 1907, there was a "Mexican School" in the system—apparently as the result of the language problem. Later there were two elementary schools populated by Mexican-American students (East Garden and West Garden). We can take 1954 as a modern point of departure. In that year the Robb School was constructed in the Mexican-American neighborhood and the Dalton school in the Anglo section. Benson was already in existence (constructed in 1937), and was centrally located. East Garden (later closed) and West Garden (now for Headstart) were the original Mexican schools. In 1966, Anthon was constructed to replace West Garden. At this point, freedom of choice was the assignment rule but a survey showed that there would be overcrowding and a capacity imbalance as to the elementary schools if freedom of choice was continued. A neighborhood or proximity-to-school assignment system was thereupon imposed.

The imposition of the neighborhood assignment system froze the Mexican-American students into the Robb and Anthon schools. There could have been no other result and this is strong evidence of segregatory intent. This evidence becomes overwhelming when considered in tandem with an additional fact. The Uvalde system consists of the City of Uvalde plus a rural area and freedom of choice assignment was continued as to the approximately 300 students residing in the rural area. Of these, 154 Anglo students opted for the Dalton school. The mandatory assignment of these students to Robb and Anthon might well have desegregated those schools.

Having concluded that the district court was clearly erroneous in finding no segregatory intent, we remand to the district court with direction that the remedy outlined in Cisneros v. Corpus Christi, *supra,* 467 F.2d 142, 152–54, be implemented.

## II

The law of this circuit as to the ability grouping issue is set out in McNeal v. Tate County School District, 5 Cir., 1975, 508 F.2d 1017. There we said:

". . . we synthesize the rule for this case to be that the court must assay the present district plan of student assignment which results in racial

segregation with a punctilious care, to see that it does not result in perpetuating the effects of past discrimination. Ability grouping, like any other non-racial method of student assignment, is not constitutionally forbidden. Certainly educators are in a better position than courts to appreciate the educational advantages or disadvantages of such a system in a particular school or district. School districts ought to be, and are, free to use such grouping whenever it does not have a racially discriminatory effect. If it does cause segregation, whether in classrooms or in schools, ability grouping may nevertheless be permitted in an otherwise unitary system if the school district can demonstrate that its assignment method is not based on the present results of past segregation or will remedy such results through better educational opportunities."

508 F.2d at 1020.

Appellants contend that the district court erred either in failing to enjoin the use of ability grouping, or in failing to infer segregatory intent from the use of ability grouping.

Ability grouping has not been employed in the elementary schools since the 1970–71 term. It was used in the junior high school with the following student assignment result in 1973–74:

### 7th GRADE

| ANGLO | | | MEXICAN–AMERICAN | | | NEGRO | | |
|---|---|---|---|---|---|---|---|---|
| HIGH | MIDDLE | LOW | HIGH | MIDDLE | LOW | HIGH | MIDDLE | LOW |
| 80 | 59 | 10 | 51 | 98 | 86 | 0 | 2 | 0 |

### 8th GRADE

| ANGLO | | | MEXICAN–AMERICAN | | | NEGRO | | |
|---|---|---|---|---|---|---|---|---|
| HIGH | MIDDLE | LOW | HIGH | MIDDLE | LOW | HIGH | MIDDLE | LOW |
| 63 | 66 | 24 | 39 | 90 | 91 | 0 | 0 | 0 |

Ability grouping is used in a few courses in some grades in the senior high school. The extent seems to be in science classes in grades 9 and 10; English in grades 9, 10, 11 and 12; and until 1974–75, math in grades 9, 10 and 11. ▮ There was a dearth of proof as to discrimination in assignment, or in effect, either as a matter of direct proof or by inference. The groupings were made on the basis of language and mathematics test scores, academic grade performance and teacher recommendations. Given that ability groupings are not unconstitutional per se, the statistical results of the groupings here are not so abnormal or unusual in any instance as to justify an inference of discrimination. The record shows no more than the use of a non-discriminatory teaching practice or technique, a matter which is reserved to educators under our system of government.

### III

It is admitted that most Mexican-American students enter school with English language deficiencies and this brings us to the next contention of appellants, that a bilingual-bicultural education program is necessary to permit the Mexican-American students to continue and develop intellectual capacity in Spanish while gradually becoming proficient in English. They point out that the school district has never applied for federally-funded programs although available, and that the refusal of the district to meet the special needs of its Mexican-American students is a form of

continuing discrimination. This again may involve a teaching technique.

We required defendants to supplement the record to the extent of disclosing any recent developments in a bilingual-bicultural approach to education. It now appears that a program was instituted in the 1973–74 school year in this regard, and that in January of 1974 a Texas statute was enacted requiring bilingual-bicultural programs in the elementary schools of Texas. Defendants represent that such a program was commenced for the first grade beginning with the 1974–75 term, and that one grade will be added each year through the sixth grade. Defendants also reported as follows:

"Oral language development is taught in Spanish. It is also taught in English at another time period.

"Culture is taught in Spanish with an emphasis on an English vocabulary.

"Math is taught primarily in English with reinforcement in Spanish.

"Science is taught primarily in English with reinforcement in Spanish.

"Our classes are kept small, not over 20–22 students in each class. We have an aide in each classroom, either the teacher or aide, in most cases both, is bilingual.

"Our bilingual-bicultural teachers all attended a bilingual-bicultural workshop provided by the Texas Education Agency this past summer. The workshop was conducted by the Bilingual Institute of El Paso, Texas."

The report also indicates other progress in the bilingual-bicultural area.

█ It strikes us that this entire question goes to a matter reserved to educators. However, on the off chance that defendants are engaging in discriminatory practices in the program as it currently exists, we pretermit decision here and remand to the district court for further consideration there on a fresh record in the event appellants determine to pursue the question.[1] It is now an unlawful educational practice to fail to take appropriate action to overcome language barriers. *See* § 204(f) of The Equal Educational Opportunity Act of 1974 [20 U.S.C.A. § 1703(f)]. *See also* Lau v. Nichols, 1974, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1.

## IV

The last assignment of error has to do with the contention that defendants discriminated in the selection and assignment of teachers and staff. This again is an issue for consideration on remand. The facts are that the number of Mexican-American teachers and their percentage to total faculty has increased substantially in recent years. They now constitute approximately 20 per cent of the total in high school, and their percentage ranges from 10 to 23 per cent in the other schools. In the school year 1974–75, there were 68 teacher aides: 26 Anglo, 41 Mexican-American, and 1 Negro. We have no up-to-date information as to staff except that the director of the bilingual-bicultural program is of Mexican-American heritage.

The entire question of faculty and staff hiring and assignment can best be considered by the district court in light of up-to-date facts and the issue will be remanded for that purpose.

Reversed as to elementary school student assignment; affirmed as to ability grouping; remanded on the issues concerning bilingual-bicultural education programs, and teacher and staff hiring and assignment.

---

1. We take note of the fact that appellants have taken a parallel course by proceeding against defendants in HEW on the same claims as were presented in the district court with the end in mind of obtaining corrective action under the penalty of having federal funds to the school district terminated. The holding to date on segregatory intent through two adjudicatory levels is the same as ours. The administrative law judge found no discrimination with respect to issues 2 (ability grouping), 3 (bilingual-bicultural training), and 4 (faculty-staff), *supra*, but was reversed as to 2 and 3 by the HEW Reviewing Authority. The entire matter is on appeal to the Secretary of HEW at this time in accordance with 45 C.F.R., § 80.10(e).